**In the Matter Of:**

Bernard vs Fayetteville State University

**JULIA FAIRCLOTH**

*March 10, 2025*

1    IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2    WESTERN DIVISION
    Civil Action No.:  5:24-CV-00219-BO-RN

3

4

5  LISA BERNARD,        )
                   )
6        Plaintiff,    )
                   )
7      vs.         )
                   )
8  FAYETTEVILLE STATE UNIVERSITY,)
                   )
9        Defendant.    )
                   )
10 _____)

11

12

13

14          DEPOSITION

15   VIA ZOOM VIDEO CONFERENCE OF

16    JULIA KATHERINE FAIRCLOTH

17

18

       Taken by Plaintiff
19      March 10, 2025
       10:00 a.m.
20

21

22 Reported by:  Ann Marie Agranoff
        Professional Reporter
23

24

25

1                          APPEARANCES

2

For the Plaintiff:

3

OSBORN GAMBALE BECKLEY & BUDD, PLLC

4   By:  Joseph D. Budd, Esq.
721 W. Morgan Street

5   Raleigh, North Carolina  27603
Email:  joe@counselcarolina.com

6

7

For the Defendant:

8

NC DEPARTMENT OF JUSTICE

9   By:  Jeremy D. Lindsley, Esq.
Assistant Attorney General

10   P.O. Box 629
Raleigh, NC  27602-0629

11   Email:  jlindsley@ncdoj.gov

12

13   Present via video teleconference:

14   Ayesha Malik
Bonita Angel

15   Joe Bates

16

17

18        Deposition of Julia Katherine Faircloth, taken

19   by the Plaintiff on March 10, 2025 at 10:00 a.m.,

20   before Ann Marie Agranoff, Professional Reporter,

21   Notary Public.

22

23

24

25

1                           CONTENTS

2

EXAMINATION                              PAGE

3

By Mr. Budd                              4

4

5

6

7

8              INDEX OF THE EXHIBITS (RETAINED)

9

Exhibit 1  -  Amended notice              4
10   Exhibit 2  -  Reduction in force policy     4
Exhibit 3  -  Interrogatory responses     4
11   Exhibit 4  -  New position emails        4
Exhibit 5  -  RIF plan for budget office    4
12   Exhibit 6  -  Budget office record       4
Exhibit 7  -  Budget analyst document      4

13

14

15

16

17

18

19

20

21

22

23

24

25

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*         *Serving all of North Carolina*      *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 4 of 109

1                    PROCEEDINGS

2                       * * * * *

3    Whereupon,

4              JULIA KATHERINE FAIRCLOTH,

5    having been first duly sworn, was examined and

6    testified as follows: Julia Katherine Faircloth

7                    EXAMINATION

8    BY MR. BUDD:

9       Q.  Thank you.  Good morning.  Is it

10   Ms. Faircloth, Dr. Faircloth?  I don't want to --

11      A.  Mrs. is fine.

12      Q.  Okay.  Well, thank you for your time this

13   morning.  My name is Joe Budd.  I'm the attorney

14   representing Lisa Bernard in this lawsuit.  Before

15   we get too into the weeds I have a few questions

16   that I want to ask you first.

17          Have you ever given a deposition before?

18      A.  If I have, I do not recall doing it.

19      Q.  Okay.  Not a problem.  Since that's the

20   case, I'm going to ask you -- I'm just going to

21   give you a few more details in addition than I

22   normally would.  Okay?  Do you understand that you

23   just told an oath to tell the truth, just like you

24   were sitting in the courthouse in front of a judge

25   and jury?

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*      *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 5 of 109

 1    A.  Yes.

 2    Q.  All right.  Is there anything that you

 3  didn't understand about the oath or your obligation

 4  to tell the truth today?

 5    A.  No.

 6    Q.  Okay.  I know this sounds intrusive and I

 7  don't intend it to be, but are you on any

 8  medication that would interfere with your ability

 9  to tell the truth today?

10    A.  No.

11    Q.  Are you on any medication or anything that

12  would interfere with your ability to answer and

13  understand my questions?

14    A.  No.

15    Q.  Okay.  Are you aware of anything that would

16  prevent you from answering my questions truthfully

17  today?

18    A.  No.

19    Q.  Okay.  There might be times today where I

20  ask you questions where you don't fully understand

21  what I'm asking, and to be honest there might be

22  times where I don't fully understand what I'm

23  asking.

24        If that is the case, could you please just

25  ask me and I'll be happy to rephrase the question

1    for you.  Okay?

2        A.  Okay.

3        Q.  And on that note, do you agree that if you

4    answer any question today, that means that you

5    fully understood the question that I asked?

6        A.  Yes.

7        Q.  Okay.  At no point in time today will I ask

8    you anything about what you or Jeremy -- what you

9    talked to Jeremy about or Ms. Angel or any other

10   attorney who is representing Fayetteville State.

11   Okay?

12       A.  Okay.

13       Q.  So if you think that's what I'm asking for,

14   I don't intend that and Jeremy will probably grab

15   the microphone and get you to stop talking.  Okay?

16            This is not a marathon.  If you need to

17   take a break at any point, just please let me know.

18   Okay?  The only thing I ask is that if we're in the

19   middle of a question, that you please just answer

20   the question that I asked and then we can take a

21   break.  Okay?

22            You're doing a great job so far.  Please

23   just verbalize any question -- any answers that you

24   make.  Even though it's a video deposition and you

25   and I can see each other, the record is not

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com                   Serving all of North Carolina         (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 7 of 109

1    necessarily going to reflect nodding.  And so if I

2    ask you, is that a yes, is that a no, I'm not

3    trying to be a jerk or being rude or at least not

4    in that instance, so I'm just asking to make sure

5    the record is clean.  Okay?

6        A.  Okay.

7        Q.  Last thing, this can sometimes get to

8    conversation.  Oftentimes in conversations people

9    are interrupting each other, talking over each

10   other, like you're anticipating what I'm saying,

11   what I'm asking and you're just going to come in

12   and answer the question.  I just ask that you

13   please do your best to try and hold off on

14   answering a question until I've asked it fully.

15   That way the transcript, at the end, again, is

16   going to be clean and neat.  Okay?

17       A.  Okay.

18       Q.  I will do my best as well.  I'm going to --

19   I do it all the time and I'm guilty of it just as

20   much as anybody else.  So I'm just asking for your

21   forgiveness in the event that I do that but also I

22   just set it out up front.  Okay?

23           Again, for the sake of a clean and clear

24   record, I'm going to use just a few terms today as

25   shorthand.  If I use the term plaintiff or Lisa or

Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 8 of 109

1   Ms. Bernard, I'm going to be referring to my

2   client, Lisa Bernard.

3           Do you understand that?

4       A.  Yes.

5       Q.  And if I use the term University or

6   defendant or FSU, I'm referring to defendant,

7   Fayetteville State University.

8           Do you understand that?

9       A.  Yes.

10      Q.  All right.  Ms. Faircloth, you are aware

11  that you've been designated pursuant to Rule

12  30(b)(6) as a corporate designee to testify on

13  behalf of Fayetteville University; correct?

14      A.  Yes.

15      Q.  And you're aware that the University has

16  given you authority to speaking on its behalf and

17  bind the organization with your testimony?

18      A.  Yes.

19      Q.  And you've agreed to do that?

20      A.  Yes.

21      Q.  Ma'am, what is your title at the

22  University?

23      A.  I'm the associate director for human

24  resources.

25      Q.  Do you know who selected you to speak on

1    behalf of FSU today?

2       A.  No.

3       Q.  Okay.  Do you have any inkling as to why

4    you were selected to speak on behalf of FSU?

5       A.  Yes.

6       Q.  Why do you think that you were selected to

7    speak on behalf of the University?

8       A.  I think because of the processes that are

9    handled in the human resources office, familiarity

10   with policy and with this specific situation.

11      Q.  Okay.  Is it safe -- fair to say that you

12   are probably the person most knowledgeable at the

13   University of the topics that are in the amended

14   notice of 30(b)(6) deposition of the University?

15      A.  Yes.

16      Q.  All right.  On that note, I think you've

17   got in front of you what I've marked as Exhibit 1.

18   That is the amended notice of 30(b)(6) deposition

19   of defendant Fayetteville University.

20      A.  Yes.

21      Q.  Do you have that in front of you?

22      A.  Yes.

23      Q.  Have you seen this document before today?

24      A.  Yes.

25      Q.  And have you seen the topics listed in this

1  exhibit?

2     A.  Yes.

3     Q.  All right.  If you haven't or if you want

4  to just refresh your recollection, there are

5  thirteen topics that are listed on this Exhibit.

6  For all thirteen of these topics are you prepared

7  to testify to those topics on behalf of the

8  University?

9     A.  Yes.

10    Q.  Did FSU conduct a complete investigation in

11 response to topics on these -- this notice?

12    A.  Yes.

13    Q.  And did you participate in the

14 investigation into those topics?

15    A.  To the extent that I was asked for

16 documentation, yes.

17    Q.  Do you know of anyone else who participated

18 into the investigation of these topics on behalf of

19 the University?

20    A.  Yes.

21    Q.  Who else?

22    A.  Ms. Bernard's supervisor, Sandra Williams.

23    Q.  Okay.  Anyone else?

24    A.  I think -- I think there may have been --

25 well, no.  I'm not sure about others.

 1      Q.  Okay.  Is there anything about these topics

 2   that you are not prepared to testify about today?

 3      A.  I would say that I'm prepared to the extent

 4   that I'm familiar with, you know, the various

 5   components.

 6      Q.  Okay.  Is there anything that you could

 7   have done to prepare for today -- for this

 8   deposition, that you were not given the opportunity

 9   to?

10      A.  No.

11      Q.  What have you done, if anything, to prepare

12   for this morning?

13      A.  I have reviewed the -- the process that we

14   used to determine the reduction in force.  I've met

15   with the supervisor, and I have seen the documents

16   that Fayetteville State provided in response.

17      Q.  Okay.  Anything else that you did to

18   prepare for today?

19      A.  Well, I met with our attorneys.

20      Q.  Okay.  And that's -- I don't want to know

21   what you talked about with them.  But anything

22   else?

23      A.  I think that's it.

24      Q.  Okay.  Are you able to estimate about how

25   many hours you spent preparing for today?

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 12 of 109

1    A.  Maybe, gosh -- no.  Because it's been over

2  a period of time.

3    Q.  Okay.  Would you guess it was more than

4  five hours?

5    A.  Well, I think it depends on what's included

6  -- what you want me to include in that.

7    Q.  How about just preparing for this

8  deposition today.  Not necessarily defending the

9  lawsuit, but preparing for this morning.

10   A.  I would say more than five hours.  Yes.

11   Q.  Okay.  More than ten?

12   A.  Probably not.

13   Q.  Okay.  Between five and ten hours.  Is that

14  fair to say?

15   A.  We'll -- we'll go with that.

16   Q.  Okay.  You're clearly not a defense

17  attorney who keeps track of their hours like second

18  nature, I'll just put it that way.

19       Did anyone from the University help prepare

20  you for this testimony?

21   A.  Yes.

22   Q.  Who?

23   A.  So, Angel Powell, and -- specifically from

24  Fayetteville State University, and Ms. Sandra

25  Williams.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com                   Serving all of North Carolina          (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 13 of 109

1      Q.  Okay.  So are you testifying that you had a

2   chance to talk with Ms. Williams in anticipation

3   and in preparation for today's deposition?

4      A.  Yes.

5      Q.  Okay.  I think you answered this question

6   already, but did you review all of the documents

7   that you -- that Fayetteville State University has

8   produced in discovery today or --

9      A.  At some stage I have seen those.  Yes.

10      Q.  Okay.  Ms. Faircloth, what is your

11   education history, just a few personal questions

12   about yourself.

13      A.  I attended the University of North

14   Carolina.  I have a business degree.

15      Q.  Was that a Bachelor's, Master's?

16      A.  It's a Bachelor's.  Yes.

17      Q.  Any other education after that undergrad?

18      A.  I think I took one or two graduate level

19   courses.

20      Q.  Okay.  Where were those?

21      A.  UNC Greensboro.

22      Q.  Were they just like one-off courses or did

23   you receive a degree for those?

24      A.  I did not receive a degree.  No.

25      Q.  Did you get any training, like, vocational

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*         *Serving all of North Carolina*      *(919) 557-4640*
Case 5:24-cv-00219-BO-RN     Document 26-2     Filed 07/07/25     Page 14 of 109

1   training since then?

2       A.  Training I have had has been with the

3   organizations I've worked with, whether going to an

4   outside course or an inside course or learning on

5   the job.

6       Q.  Okay.  Have you ever received any

7   certifications for human resources or employment

8   law?

9       A.  No.

10      Q.  Have you ever attended any seminars on

11  employment law?

12      A.  Yes.

13      Q.  What seminars were those?

14      A.  I don't know that I could name them all,

15  but I have, you know, been to EEOC courses.

16      Q.  Okay.

17      A.  Yeah.

18      Q.  Okay.  Were those courses hosted by the

19  EEOC or were they -- yeah -- sorry.

20      A.  Yeah.  So I have been to courses hosted by

21  the EEOC.  I have also been to courses that, you

22  know, attorneys have put on on the topics of EEO.

23      Q.  About how long have you been working in the

24  human resources field?

25      A.  Since January of, I think, 1989.

Case 5:24-cv-00219-BO-RN   Document 28-2   Filed 07/07/25   Page 15 of 109

1     Q.  Has it always been for public universities

2  or the like?

3     A.  No.

4     Q.  Have you ever worked for a private company

5  or anything like that?

6     A.  Yes.

7     Q.  How long did you do that for?

8     A.  27 and a half years.

9     Q.  Okay.  Was it one company or several

10  different companies?

11     A.  It was one company.

12     Q.  Which company was that?

13     A.  American Express.

14     Q.  So how long have you been employed by the

15  University here?

16     A.  I've been here eight years and a couple

17  months.

18     Q.  Have you had the same position since you

19  were hired?

20     A.  Yes.

21     Q.  Have your job duties changed in any way

22  since you were hired?

23     A.  Yes.

24     Q.  Significantly?

25     A.  Well, yes.

Case 5:24-cv-00219-BO-RN   Document 26-2   Filed 07/07/25   Page 16 of 109

1    Q.  How have they changed?

2    A.  I would say the most significant change is

3  that we had a benefits -- employee benefits unit

4  here.

5    Q.  Okay.

6    A.  And that is now being handled by the UNC

7  system and so the relationship is, you know, with

8  them as opposed to directly with our employees.

9    Q.  Okay.  Have you always -- in your eight

10  years with the University, have you always been

11  involved in reductions in force at the University?

12    A.  Yes.

13    Q.  Okay.  What is your specific role or job

14  duty as it relates to reductions in force at the

15  University?

16    A.  So, I have since -- I would say that my

17  involvement in the last five or six years has been

18  to work with the supervisor or supervisors or

19  leader designated in an area to determine what the

20  situation is, review against policy, what needs to

21  occur, what options they might have, and then help

22  them put together the packet that has to be

23  approved at higher levels.

24    Q.  Okay.  Have the policies regarding

25  reduction in force changed in the eight years since

Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 17 of 109

1   you've been with the University?

2       A.  I would say that there has been one major

3   change that comes to mind.

4       Q.  Okay.  What is that?

5       A.  It used to be that there has to be a loss

6   in funding that resulted in a reduction in force

7   and that is no longer the case.

8       Q.  Okay.  Any other major changes that you can

9   recall in your time at the University about the

10  reductions in force?

11      A.  No.

12      Q.  Ms. Faircloth, is the University subject to

13  the state human resources manual issued by North

14  Carolina State?

15      A.  So, yes.

16      Q.  Okay.  Are you familiar with the human

17  resources manual?

18      A.  Yes.

19      Q.  All right.  Are you aware that the human

20  resources manual states that the state is committed

21  to insuring the administration and implementation

22  of all human resources policies, practices and

23  programs are fair and equitable, that state

24  agencies, departments in universities shall be

25  accountable for administering all aspects of

1   employment, including hiring, dismissal,

2   compensation, job assignment, classification,

3   promotion, reduction in force, trainings, benefits

4   and any other terms and conditions of employment in

5   accordance with federal and state EEO laws and

6   policies.

7         Are you familiar with and aware that it

8   says that?

9      A.  I am not familiar with exactly where that

10  is located in the materials but it does sound like

11  it's there.  I mean, that is logical to me.

12     Q.  It's consistent with your understanding of

13  the employee -- of the human resources manual;

14  correct?

15     A.  Yeah.  Yes.

16     Q.  All right.  Does the University share this

17  commitment as set out in this human resources

18  manual?

19     A.  Yes.

20     Q.  And does the University agree that it shall

21  be accountable for administering all aspects of any

22  reduction in force in accordance with federal and

23  state EEO laws and policies?

24     A.  Yes.

25     Q.  All right.  Ma'am, if you could, I think

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*      *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 19 of 109

1    you should have Exhibit 2 in front of you, which is

2    the reduction in force policy?

3        A.  Yes.

4        Q.  I've got it as it should be about -- it's

5    marked pages nine through fifteen on the bottom

6    right.  Is that what's in front of you?

7        A.  Yes.

8        Q.  All right.  Ma'am, does this appear to be

9    the state agency's policy governing reductions in

10   force effective October 7, 2021?

11       A.  Yes.

12       Q.  All right.  Is the policy that's in Exhibit

13   2 the policy that governed how defendant was to

14   conduct any reduction in force among its personnel?

15       A.  Yes.

16       Q.  And was this Exhibit 2, was that the policy

17   that was in force at the time of Ms. Bernard's

18   separation?

19       A.  Yes.

20       Q.  Okay.  Are there any other policies that

21   were in force at the time of Ms. Bernard's

22   separation that would have govern how defendant was

23   to conduct any reduction in force?

24       A.  There -- yes.  Yes.

25       Q.  And what were those?

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 20 of 109

1       A.  There's a reduction in force priority

2    policy.  There's also a separation policy.

3       Q.  Okay.  Walk me through what those are.

4    What -- what's the first one?

5       A.  So, the reduction in force priority, it

6    outlines how an employee impacted by a reduction in

7    force has priority over other applicants in certain

8    situations for job openings.

9       Q.  Okay.

10      A.  If they -- yeah.

11      Q.  Okay.  Does that govern how a reduction in

12   force is to take place?

13      A.  No.

14      Q.  Okay.  It just deals with the consequences

15   of a reduction in force?

16      A.  Right.

17      Q.  Okay.

18      A.  Yes.

19      Q.  What about other -- I apologize.  What was

20   the other policy that you mentioned?

21      A.  The policy on separation.

22      Q.  Okay.  And that's dealing with any type of

23   separation with the University?

24      A.  It is.  It goes through -- it goes through

25   numerous situations but there is a piece in there

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com                Serving all of North Carolina          (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 21 of 109

1    that could be applicable to a reduction in force.

2        Q.  Okay.

3        A.  Which is about severance pay.

4        Q.  Oh, okay.  Does it have anything in there

5    that governs how a reduction in force is to take

6    place?

7        A.  I do not think so.

8        Q.  Aside from those two policies that we just

9    discussed, are there any other policies that you

10   can think of that would -- or that are supposed to

11   govern a reduction in force?

12       A.  No.

13       Q.  Okay.  Does the University agree that the

14   reduction in force policy that I've handed you as

15   Exhibit 2, that one of the purposes of that policy

16   is to insure that employees are treated fairly and

17   in a non-discriminatory manner when they are

18   subjected to a reduction in force?

19       A.  Yes.

20       Q.  Would you agree then that if the University

21   didn't comply with the policy, it would increase

22   the chances that a person subjected to a RIF could

23   be treated unfairly by the University?

24           MR. LINDSLEY:  Objection.

25           MR. BUDD:  You can still answer the

*www.NCDepo.com*               *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*       *(919) 557-4640*
Case 5:24-cv-00219-BO-RN   Document 28-2   Filed 07/07/25   Page 22 of 109

1    question if you understand it.

2              THE WITNESS:  Will you ask again,

3    please just say it one more time.

4              MR. BUDD:  Sure.  That's all right.

5    Would you agree that if the University did not

6    comply with this policy in Exhibit 2, that it would

7    increase the chances that a person subjected to a

8    RIF would be treated unfairly by University

9    -- could be treated unfairly by the University.

10             MR. LINDSLEY:  Same objection.

11             THE WITNESS:  I mean, I don't know,

12   honestly.  I mean, it just -- I think it depends on

13   a lot of things.

14             MR. BUDD:  Right.  So if it doesn't --

15   if one of the purposes of the policy is to protect

16   employees -- correct?

17             THE WITNESS:  Yes.

18             MR. BUDD:  Yeah.  And if the

19   University does not follow the policy, wouldn't it

20   follow logically that it would increase the chances

21   that treated unfairly?

22             MR. LINDSLEY:  Objection.

23   BY MR. BUDD:

24      Q.  Again, you can still answer it if you

25   understood the question.

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com               Serving all of North Carolina          (919) 557-4640
Case 5:24-cv-00219-BO-RN     Document 26-2     Filed 07/07/25     Page 23 of 109

1     A.  I think it could.  It could.

2     Q.  Okay.  Thank you.

3          So let's go to specifics on Exhibit 2, if

4  you could.

5     A.  Okay.

6     Q.  I have some questions about it, me being

7  not fully versed in some of this -- some of this

8  language.  I'd love to hear what the University's

9  understanding of this is.

10          Let's start in section one where it says

11  policy.  Do you see that?

12     A.  Yes.

13     Q.  So, I want to point you to the third bullet

14  point here it says abolishment of a position.  Do

15  you see that?

16     A.  I do.

17     Q.  What does that mean?  How is that different

18  than loss of work or other material changes which

19  we'll get to next?

20     A.  It simply means that the position itself is

21  going away, the position is not going to be here

22  anymore.  And you're asking me to compare that with

23  loss of work or shortages?

24     Q.  Yes, ma'am.

25     A.  It might be -- to me they could be very

Case 5:24-cv-00219-BO-RN     Document 26-2     Filed 07/07/25     Page 24 of 109

1    similar.  There could be overlap there.

2        Q.  I got you.  Okay.

3        A.  Yeah.

4        Q.  Who decides to abolish a position in this

5    circumstance?

6        A.  So typically that comes from the department

7    or the division, the higher level division that has

8    the position.

9        Q.  Okay.  And so the decision then is made by

10   the division head?

11       A.  It would -- yes.  It would go to that level

12   even if a supervisor at a lower level thought that

13   should happen, the division head would make the

14   decision.

15       Q.  Okay.  Have you ever seen that specifically

16   happen?

17       A.  I have.  Yes.

18       Q.  Okay.  Was that what happened with

19   Ms. Bernard or is this -- would she fall under

20   another category here?

21       A.  Her situation fell kind of to the last

22   bullet.

23       Q.  Okay.

24       A.  The material changes in position or

25   organization and that lead to abolishing the

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*        *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 25 of 109

1   position.

2      Q.  Got you.  Okay.  So then let's turn to

3   other material changes in position, duties or

4   organization.

5          Now, I kind of understand.  The example I

6   could think of when I was working on this was I

7   could understand why the University does not want

8   to employ typewriter repairmen -- right -- like

9   that -- that position is clearly going away.

10  Right?  I could see that the University wants to

11  modify and update it.  Right?  That's not going to

12  happen all the time, something that -- so clear.

13  Right?  What -- what, in your experience, falls

14  under material changes under this policy?

15     A.  Right.  Right.  So, it's possible that a

16  unit could have new work that requires a different

17  skill set, different competencies for the

18  individual or individuals doing the work.

19     Q.  I'm sorry to interrupt.  So like a new

20  computer software?

21     A.  Maybe.  That's possible, I guess.

22     Q.  Okay.  I'm sorry to interrupt.  What else

23  were you going to say on that?

24     A.  No.  I mean, that I think that could be an

25  example, if you need someone with a different

1    skill, in your example to use a new software, you

2    might need to create a higher level position to get

3    the right person into that job who has that type of

4    skill set and can perform those duties.

5        Q.  Does the University have any set definition

6    of what the word material means in this policy?

7        A.  Not that I'm aware of.

8        Q.  Is it safe to say then that is left up to

9    the individual supervisors or department heads who

10   are asking for the RIF?

11       A.  I don't know that it would be solely up to

12   them.

13       Q.  Okay.

14       A.  It would probably be in consultation with

15   the office of human resources.

16       Q.  And that would be someone like you,

17   yourself?

18       A.  It depends.  So --

19       Q.  Okay.

20       A.  That's -- if -- so, I might have to bring

21   in other people if they were coming to me to say,

22   hey, we're going to have a change, et cetera, or

23   perhaps that would already have been done, and for

24   example, when we look at changes in duties or in

25   organization, that often falls into human resources

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*          *(919) 557-4640*
Case 5:24-cv-00219-BO-RN   Document 26-2   Filed 07/07/25   Page 27 of 109

1    classification and compensation.

2        Q.  Okay.

3        A.  Just not --

4        Q.  Got you.

5        A.  -- my area.

6        Q.  Okay.  Sitting here today, how would the

7    University define material in this statute -- in

8    this policy?

9        A.  Well, if it was in an organization it would

10   likely mean that -- I'm saying likely because we

11   don't have a written specific black and white

12   definition of that.  It would probably mean that

13   there are fewer positions, different positions,

14   more positions, different leadership, different

15   reporting structure.  It could mean many things.

16       Q.  Okay.  Was that the same -- would you say

17   that's the same definition that was in place at the

18   time of Ms. Bernard's RIF?

19            MR. LINDSLEY:  Objection.

20   BY MR. BUDD:

21       Q.  You can answer if you understood the

22   question.

23       A.  I would say that the changes for that

24   organization were significant.

25       Q.  Let me ask it a different way, because what

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 28 of 109

1    I'm asking is, the definition that you just used

2    for the term material, I think I asked the question

3    poorly because what I want to -- I think I asked it

4    as what's the definition sitting here today.  I

5    really want to know what was the definition on the

6    day of Ms. Bernard's RIF.  Would it be the same

7    thing?

8        A.  So, I don't know that it was a definition

9    as much as it was going through the details

10   specific to that budget office.

11       Q.  Okay.  Let me -- I'm sorry.  Let me ask it

12   one more time.

13           How did the University define material as

14   it's used in that policy, on the day that

15   Ms. Bernard's RIF went into effect?

16       A.  So, the budget department no longer needed

17   an accounting technician.  They needed a higher

18   level position that required -- the duties were

19   different requiring more significant -- not more

20   significant, but more focus on analysis,

21   independent decision making, that sort of thing.

22   So it was a much more analytical role that was

23   needed.

24       Q.  Okay.  As I'm asking these questions, I

25   want to add one more definition to what we were

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*         *Serving all of North Carolina*      *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 29 of 109

1  talking about before for -- just, again, for a

2  clear transcript.

3          When I use the term RIF, you understand

4  that I'm using it to mean a reduction in force.

5  Right?

6      A.  Yes.

7      Q.  You understand that?

8          All right.  Let's go look a little bit

9  further down on section one here.  I -- I'd like to

10  ask you, an agency or University may not use the

11  RIF process to circumvent the disciplinary process

12  required to separate or demote an employee for a

13  disciplinary reason.

14          Do you see that?

15      A.  I do.

16      Q.  What does that mean?  Is a disciplinary

17  reason the same thing as performance based?

18      A.  So disciplinary can be performance,

19  attendance, behavior.  There could be discipline

20  for any of those categories of things.

21      Q.  Okay.  So my understanding then is, like,

22  the way -- this process -- the RIF process is not

23  intended to get rid of a low performing employee

24  because they are low performing; correct?

25      A.  Correct.

*www.NCDepo.com*                *Depositions, Inc.*
*info@NCDepo.com*           *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN     Document 26-2     Filed 07/07/25     Page 30 of 109

1      Q.  Okay.  Thank you.  If you turn with me to

2  page ten here then, please.  It's just the next

3  page.  Are you there?

4      A.  I am.

5      Q.  Section three, area analysis for RIF.

6  There's the -- there's a section relative

7  efficiency.  Are you seeing that?

8      A.  I do.

9      Q.  All right.  How does relative efficiency --

10  thinking how to ask this question.

11          If the RIF policy is not intended to be

12  used to get rid of low performing employees, how

13  does that goal gel with relative efficiency being

14  considered as a factor for the RIF?

15      A.  So, in an area impacted by a reduction in

16  force, there could be a point where the

17  employees -- you know, if -- you know, the

18  employees in the role -- so if there were ten, ten

19  people who were in a specific job, and there was

20  really no difference in what they did and we needed

21  to cut that in half.  Okay?

22      Q.  Mm-hmm.

23      A.  There would be a comparison of those

24  employees, kind of looking at these factors,

25  including relative efficiency.

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*      *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 31 of 109

1     Q.  Got you.  Okay.  So it is allowed to be

2  considered as a factor after the determination that

3  a RIF needs to occur; correct?

4     A.  Correct.

5     Q.  And -- okay.  But it can't be the impetus

6  for the RIF?

7     A.  That's correct.

8     Q.  Got you.  Okay.  Got you.  Okay.  Who was

9  in charge of preparing the employee's overall

10  performance rating?  Do you see in the policy in

11  section two it says it's based on the most recent

12  overall performance rating?

13     A.  Yes.  That is the direct supervisor of the

14  employee.

15     Q.  Okay.  Is it allowed to be the same person

16  who determines whether or not there are other

17  material changes in the position, duties or

18  organization?

19     A.  Yes.  It could be the same.

20     Q.  It could be the same person?

21     A.  Yes.

22     Q.  So it can be the same person who determines

23  that a RIF is necessary as -- that could be the

24  same person who issues the direct -- the most

25  recent and overall performance rating?

1   A.  Yes.

2   Q.  Okay.  So then theoretically a department

3  head can identify a material change under that

4  policy then use the performance review that they

5  wrote as the justification for targeting someone in

6  a RIF?

7        MR. LINDSLEY:  Objection.

8        MR. BUDD:  Again, you can answer if

9  you understood the question.

10       THE WITNESS:  So, ask it again

11  because -- yeah.  Just ask it one more time.

12       MR. BUDD:  Sure.  I'll ask it this

13  way.  Theoretically a department head could

14  determine that a RIF is necessary then also use the

15  performance review they just wrote as justification

16  for targeting that person in a RIF?

17       MR. LINDSLEY:  Objection.

18       THE WITNESS:  I would say that if a

19  RIF had already been planned, that probably a

20  performance evaluation would not be completed after

21  that.

22  BY MR. BUDD:

23   Q.  But what about the performance evaluation

24  prior to the RIF?  They could have been the ones to

25  draft that performance evaluation; correct?

1    A.  Yes.  That could happen.

2    Q.  Moving on to section three right below

3  that, actual or potential adverse impact.

4        Are you there with me?

5    A.  Yes.

6    Q.  I'd like to ask you about the section where

7  it says all decisions concerning reduction in force

8  must be analyzed to determine their impact on

9  agency utilization goals based on race and sex to

10  avoid adverse impact in violation of section 4

11  point -- 4 D of the uniform guidelines on employee

12  selection procedures as applied to selection rights

13  for separation through RIF?

14        Did I read that correctly?

15    A.  Yes.

16    Q.  Do you know why age is not included in

17  here?

18    A.  I do not know.

19    Q.  I think we mentioned or does the state --

20  when I asked you about the state human resources

21  manual, it mandates employees to comply with and

22  insure that age is a protected category under human

23  resources policies; correct?

24    A.  Yes.

25    Q.  Okay.  Does the University consider itself

Case 5:24-cv-00219-BO-RN     Document 26-2     Filed 07/07/25     Page 34 of 109

1  to be outside of the scope of federal laws

2  preventing age discrimination?

3      A.  No.

4      Q.  Okay.  So would you agree that age should

5  be included as -- when evaluating the actual or

6  potential adverse impact under policy -- under area

7  three in this policy?

8      A.  Yes.

9      Q.  Okay.  Let's turn the page to page eleven

10  then, please.  Just let me know when you get there.

11      A.  I'm there.

12      Q.  Okay.  Section four where it says avoiding

13  a RIF.  A decision to implement a RIF must be

14  reached only after the systematic considerations of

15  actions designed to avoid the layoff.

16          Did I read that correctly?

17      A.  Yes.

18      Q.  What does systematic consideration mean to

19  the University?

20      A.  In a nutshell it means that we would look

21  for other options other than simply going directly

22  to the reduction in force.

23      Q.  Is there a set -- is there a set guideline

24  or policy that would qualify as systematic

25  consideration of actions?

1    A.  So typically, yes, I would say there is a

2  structure that's followed normally, at least in

3  practice.

4    Q.  Okay.  Can you describe that process for

5  me.

6    A.  Sure.  So, if we -- you know, if we know

7  that a position is going to be eliminated or -- you

8  know, and may be subject to a RIF, we're looking --

9  if there's a person in the job, we're looking to

10  see if we can keep that person whole by moving them

11  into a comparable position.  So, we look to see, is

12  there an open position that's the same as what

13  they're in, basically, same title, same job family,

14  same pay, and for the state positions such as the

15  State Human Resources Act, you know, also we'd be

16  looking to see if the position title is there plus

17  the competency level that that person is in and

18  that would be considered comparable.

19    Q.  Anything else that the University is

20  supposed to do when considering these things?

21    A.  Right.  So, we could -- you know, we could

22  also, within that same job family look to a lower

23  level position and then they have the RIF priority

24  in hiring, so we make sure the employee, once

25  they're notified, that they're aware of that as

1   well, and, you know, we just make the jobs -- make

2   sure they know where to find the jobs that are

3   available.  We remain open to help them if we find

4   anything for them, before their last day.  You

5   know, that's essentially what we do.

6         Now, we would also look beyond and compare

7   them to people who are in that same job, job

8   family, to see if anyone there is a probationary

9   employee or a temporary employee, so they don't

10  have career status yet, because if the person being

11  impacted by the RIF could learn that job, if it's

12  the same job title, it might still have different

13  duties, so if they could learn that job, then we

14  would -- we would separate the person who is not

15  career status or who is temporary in order to have

16  a job for the person that would be impacted by the

17  RIF otherwise.

18     Q.  Got you.  Anything else in your experience

19  that the University does to engage in systematic

20  consideration of actions to avoid a RIF?

21     A.  No.

22     Q.  Okay.  I think if you look down a little

23  bit further in that policy, it says these actions

24  may include but are not limited to the elimination

25  of vacant positions.  I guess I'm just going to ask

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*        *Serving all of North Carolina*          *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 37 of 109

1   you for each of these, have you ever seen the

2   University do this, do this action.

3           So have you ever seen them eliminate a

4   vacant position?

5       A.  Well, I have seen vacant positions

6   eliminated but are you -- kind of clarify.

7       Q.  To avoid a RIF.

8       A.  I have not.

9       Q.  Has the University ever reduced

10  non-personnel related expenses to avoid a RIF?

11      A.  Not that I'm aware of.

12      Q.  Has the University ever placed an employee

13  in a vacant position for which the employee

14  qualifies.  I think that's what you talked about

15  earlier.

16      A.  Yes.  We have.

17      Q.  Okay.  And has the University ever

18  retrained employees to facilitate placement in

19  other positions at the agency or University?

20          I think you mentioned retraining earlier,

21  but is there anything more formal than that?

22      A.  I'm not immediately thinking of an example.

23      Q.  Okay.  Are there any other actions that

24  you've seen the University undertake to avoid a RIF

25  that are not listed there?

Case 5:24-cv-00219-BO-RN     Document 26-2     Filed 07/07/25     Page 38 of 109

1      A.  No.

2      Q.  Big picture about Exhibit 2.  Who at the

3   University is in charge of insuring the

4   University's compliance with the policy?

5      A.  It would be the head of human resources.

6      Q.  Anyone else in charge of insuring

7   compliance?

8      A.  The chancellor.

9      Q.  Okay.  Anyone else?

10     A.  I think the legal affairs office at times.

11     Q.  Okay.  What do each of those individuals do

12   to insure the compliance with this policy?

13     A.  With the RIF policy specifically?

14     Q.  Yes, ma'am.

15     A.  Okay.  So, the head of human resources is

16   aware of reduction in forces that are proposed,

17   available for consultation, involvement as needed,

18   refuse the plan.  There's a plan that has to be put

19   together with the details of what's happening, why

20   are we doing a RIF, who is impacted, who's not

21   impacted, the kind of demographics analysis that

22   has to be done.  There's a checklist and then

23   there's the severance information.  So, the head of

24   human resources reviews that and signs it and

25   they're reviewing in conjunction with the policy

1   then taking it to the chancellor to review it, of

2   course at a very high level because that signature

3   is required as head of agency.  We inform the legal

4   office and -- but I don't know that they have gone

5   through and reviewed all of that documentation in

6   the past.

7       Q.  Okay.  So if I could just summarize what I

8   think I just heard -- and correct me if I'm wrong

9   on any of this -- the head of human resources at

10  the University is supposed to review the proposed

11  RIF, sign off on it and present it to -- I think

12  you said the chancellor --

13      A.  Correct.

14      Q.  -- for their signature but you're not

15  entirely sure at what level of review the

16  chancellor normally gives to this?

17      A.  Right.

18      Q.  Is that -- okay.  And it's presented to

19  legal counsel but their approval is not necessary

20  for a RIF to go forward; correct?

21      A.  That's correct.

22      Q.  Okay.  Are the approvals of the chancellor

23  and the human resources head required for the RIF

24  to proceed?

25      A.  Yes.

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 40 of 109

 1      Q.  Okay.  Is there anything aside from the RIF

 2  policy that the chancellor and the human resources

 3  head are supposed to review when evaluating this --

 4  any potential RIF?

 5      A.  No.

 6      Q.  Okay.  Ma'am, if you don't mind I think now

 7  is probably a decent time to just take a quick

 8  break, stretch our legs, go off the record for five

 9  minutes or so.

10          (A brief recess was taken.)

11  BY MR. BUDD:

12      Q.  Ms. Faircloth, we just took a very short

13  break.  Is there anything you'd like to change in

14  any of your previous answers to the questions I've

15  asked?

16      A.  Well, if I could, I'd like to maybe clarify

17  a couple of points.

18      Q.  Please do.

19      A.  You had asked about who -- I think you

20  asked who in the University has reviews and

21  approves RIF.  I don't know if you want me to kind

22  of go beyond here on this campus, because it does

23  go outside of the campus.

24      Q.  I would love to know everybody who's

25  approved them or reviewed them.

Case 5:24-cv-00219-BO-RN   Document 28-2   Filed 07/07/25   Page 41 of 109

1    A.  Okay.  So for clarification, our legal

2  office does review -- and it's not just the policy,

3  it's the RIF plan, which is all the documentation

4  we have to prepare, they're thinking about that, to

5  make sure that we are following the policy, being

6  fair, et cetera.  And then the chancellor signs it

7  and then it is sent up to the UNC system human

8  resources office for their review and approval.

9        So that's kind of how that happens.  But

10  it's that entire set of RIF documentation.  So it's

11  the plan, it's an adverse impact analysis, the

12  checklist, the severance payment request.  Those

13  things.

14    Q.  Okay.  On that point then, are you aware of

15  what the State UNC system does to review a

16  potential RIF or a proposed RIF?

17    A.  No.

18    Q.  Okay.  Do you know if they are supposed to

19  look at anything beyond the paperwork that

20  Fayetteville State presents to them?

21    A.  I don't know.

22    Q.  Okay.  Anything else that you'd like to add

23  or change in your -- to your previous testimony?

24    A.  I don't think so.

25    Q.  Okay.  Thank you, ma'am.

Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 42 of 109

1          Ma'am, do you have Exhibit 3 in front of

2    you?  Those are the defendant's responses to

3    plaintiff's first set of interrogatories and

4    request for production of documents.

5       A.  Yes.

6       Q.  I think, if you look on page -- second to

7    last page in that packet, it has your signature

8    with your note -- your notarized signature?

9       A.  Yes.

10       Q.  All right.  Is there anything in these

11    discovery responses that is incorrect or needs to

12    be revised or is incomplete?  And if you need to

13    take a minute, please take your time.

14          MR. LINDSLEY:  Joe, just for the

15    record, I'll object just on the basis that some of

16    these have been supplemented since these answers

17    were provided.

18          MR. BUDD:  Yeah.  I apologize.  Let's

19    focus on the interrogatory responses because I

20    don't think you've supplemented the interrogatory

21    responses.  Is that correct?

22          MR. LINDSLEY:  I believe that's

23    correct.  Although some may, by way of additional

24    document production, have been addressed but go

25    ahead.  Ask your questions and we'll address each

Case 3:24-cv-00219-BO-RN     Document 26-2     Filed 07/07/25     Page 43 of 109

1    one.

2          MR. BUDD:  Okay.  I -- honestly, for

3    right now, all I'd like her to do is just -- if

4    there's anything additional that needs to be

5    changed -- actually let's just go off the record

6    for a second.

7          (Discussion off the record.)

8          MR. BUDD:  We can go back on then.

9    BY MR. BUDD:

10        Q.  All right.  Ms. Faircloth, I think you've

11   just taken the last few minutes and reviewed

12   Exhibit 3 to this deposition.

13          Is there anything to your knowledge that

14   needs to be changed, amended, added to or revised

15   in any way?

16        A.  Not to the best of my knowledge.  No.

17        Q.  Okay.  All right.  You can put that to the

18   side then.  I apologize for a bit of housekeeping

19   on that front.

20          If you could then pull up Exhibit 4,

21   please.  Let me know when you have that.

22        A.  What would it be?

23        Q.  It is -- the first page is an email dated

24   February 10th, 2023 from Sandra Williams to Sheila

25   Wright Zeigler.

www.NCDepo.com                *Depositions, Inc.*
info@NCDepo.com              *Serving all of North Carolina*        (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 44 of 109

1    A.  Yes.

2    Q.  It should be a thirteen page document.

3    A.  Yes.

4    Q.  Okay.  Does this appear to be an email

5   chain and attachments produced by defendant in this

6   matter with the first email being dated January

7   24th, 2023 from Sandra Williams to Sheila Wright

8   Zeigler?

9    A.  Yes.

10    Q.  And on the first page -- I hate -- I'm

11  sorry if you're flipping back and forth -- the

12  first page it says Kate Faircloth.

13          Do you remember receiving this email chain

14  back in February, 2023?

15    A.  I do not remember this, but clearly I was

16  copied on it.

17    Q.  Okay.  All right.  Now, to continue

18  flipping back and forth.  We're going to go from

19  back to forward on this exhibit, if you don't mind.

20    A.  Okay.

21    Q.  So if you turn to the last page, page

22  thirteen.  Let me when know when you're there.

23    A.  Okay.  I'm there.

24    Q.  Does this appear to be a chart, like a flow

25  chart, an organization chart?

1      A.  It is.

2      Q.  All right.  What is this organization

3  chart?

4      A.  This was the current state of the budget

5  office organization on March 1st, 2023.

6      Q.  Okay.  Does this chart -- what do the

7  proposed -- do you see how some of those boxes

8  there's proposed in bold capital letters?

9      A.  Yes.

10      Q.  What does it mean for one of those boxes to

11  have proposed in it?

12      A.  So, it's a proposed position that doesn't

13  exist at that time.  It could be a new position.

14  It could be a position that's being changed.

15      Q.  Okay.

16      A.  Or reclassified is a term that we use.

17      Q.  Got you.

18          So is it safe to say that looking at this

19  chart on March 1st, 2023, as of March 1st, 2023,

20  there were four proposed changes to four different

21  positions in the budget office?

22      A.  Yes.

23      Q.  There are the two new budget analyst

24  positions; correct?

25      A.  Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com                   Serving all of North Carolina              (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 46 of 109

1     Q.  There's a proposed administration support

2   specialist position.  Is that a new position or a

3   re-org of a position?

4     A.  I'm not sure.

5     Q.  Okay.  Is there any way to find out the

6   answer to that question?

7     A.  I can find out.  It has a position number

8   already so it's possible that it might have just

9   been established or it could have been there and,

10  you know, they made a change to it and maybe that's

11  why it's in yellow or they're proposing a change to

12  it.  So I would have to -- I would have to look

13  that up.

14    Q.  Okay.  Thank you.  And then what was

15  changed -- if you know, what was changed for the

16  associate VC for budgets, financial planning and

17  analysis position?

18    A.  I believe they were proposing a position

19  title change from assistant vice chancellor to

20  associate vice chancellor.

21    Q.  Okay.

22    A.  Which brings it to a little bit higher

23  level.

24    Q.  It's a promotion?

25    A.  Yes.

*www.NCDepo.com*          *Depositions, Inc.*
*info@NCDepo.com*       *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 47 of 109

1      Q.  Okay.  Does this chart depict anything

2  happening to Ms. Bernard's position?

3      A.  To me, it appears -- and I think this is

4  what they were trying to convey -- that the

5  accounting technician position was filled at that

6  point on March 1st but that position would be

7  basically abolished in lieu of this proposed budget

8  analyst one position.

9      Q.  Okay.  What in the chart suggests to you

10  that that was the intention?

11      A.  It's not in the chart --

12      Q.  Okay.

13      A.  -- as much as it's in the other documents.

14      Q.  Okay.  Thank you.  According to this chart,

15  is the -- and this just might be poor graphic

16  design.  Right?  Is the administration support

17  specialist above or below accounting technician or

18  is it separate and apart?

19      A.  Can you ask that a different way?

20      Q.  Sure.  And again, I'm -- I'm seeing -- this

21  is where the Zoom deposition has its limitations

22  because I would be pointing to you.  It looks like

23  there is a line that goes to the shadow of the

24  administration support specialist box and I can't

25  tell if that's just supposed to go around the

*www.NCDepo.com*                *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN     Document 28-2     Filed 07/07/25     Page 48 of 109

1  administration support specialist box or if it's

2  supposed -- or if the accounting technician is

3  posed to report to the administration support

4  specialist.

5      A.  Got it.  Okay.  So, the administrative

6  support specialist would report to Ms. Williams.

7  Okay?  And this accounting technician position

8  would also report to Ms. Williams.  So it's going

9  around and bringing all of the positions across the

10  bottom and the admin support specialist all

11  reporting -- each reporting directly to

12  Ms. Williams.

13      Q.  Got you.  Okay.  Thank you.  I have

14  Googled -- and be careful what you Google -- right

15  -- but I have Googled other administration support

16  specialist position openings at Fayetteville State

17  University and they all appear to be clerical

18  secretarial receptionist type work.

19          Would you say that's a fair

20  characterization of the administration support

21  specialist role?

22      A.  No, not without looking each individual

23  position description.

24      Q.  Okay.

25      A.  I would have to look at the details.

1      Q.  Okay.  Do you know what the administration

2   support specialist role was supposed to be in the

3   budget office?

4      A.  I think it was providing clerical support

5   to Ms. Williams but again, there are probably quite

6   a few details in that position description that

7   would clarify.

8      Q.  Okay.  Okay.  Thank you.  Ms. Bernard was

9   not supposed to report to that -- the

10  administration support specialist; correct?

11     A.  No.

12     Q.  Okay.  All right.  So then let's flip to --

13  let's flip ahead several pages.  Go to page six if

14  you could.

15     A.  Okay.

16     Q.  Okay.  Very brief question about this.  It

17  says somewhere in the first full paragraph there,

18  division of business and finance slash budget

19  office is requesting to reclassify current position

20  accounting technician advanced to budget analyst

21  two due to change of duties and responsibilities.

22        I think I modified the grammar a little bit

23  but is that essentially what it says there?  It's

24  about the middle of the first paragraph.

25     A.  Okay.

1     Q.  Did I read that and represent that fairly?

2     A.  Yes.

3     Q.  Okay.  Was Ms. Bernard an accounting

4  technician advanced?

5     A.  No.  She was not.

6     Q.  Okay.  So was this reclassification, was

7  this explicitly -- this was not explicitly for

8  Ms. Bernard, was it?

9     A.  No.

10     Q.  Okay.  So then let's move to page three

11  please.  Let me know when you're there.

12     A.  Okay.

13     Q.  I'm looking at the email dated February

14  7th, 2023, from Sandra to Sheila Wright Zeigler.

15        Do you see it?

16     A.  I do.  Yes.

17     Q.  All right.  Specifically, I want to -- I

18  highlighted, review revised job description for

19  position 000090 to -- and reclassify as budget

20  analyst one.  That was Ms. Bernard's position;

21  correct?

22     A.  That is correct.

23     Q.  Okay.  Is there a job description in this

24  Exhibit 4 to reclassify as budget analyst one?

25     A.  No.  I do not see one.

Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 51 of 109

1     Q.  Okay.  Are you aware of any conversations

2  or discussions before February 7th, 2023, about

3  reclassifying Ms. Bernard's position?

4          I will represent to you that upon my review

5  of the records -- and I might have missed something

6  -- upon my review of the records provided by the

7  University this to me is the first reference

8  chronologically in writing of a reclassification of

9  Ms. Bernard's position.

10          Are you aware of anything prior to this

11  that I might have missed or was not a party to,

12  that addressed reclassification?

13     A.  I do not recall being aware of anything

14  prior to this.

15     Q.  Okay.  Do you know, then, what Ms. Williams

16  was following up on in this email then?

17     A.  I do not.

18     Q.  Would Ms. Williams be the best person to

19  ask about that question?

20     A.  Probably yes, but I would say based on, you

21  know, the documents and this org chart, that she

22  probably had been working with Ms. Zeigler in

23  discussing her needs for the organization, but I

24  was not aware, you know, sooner, to the best of my

25  knowledge.

Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 52 of 109

1     Q.   Okay.  Let's go to page two then, please.

2  Just the next page.  This is three days later,

3  February 10th, at 9:36.  It's the email on the

4  bottom.  It says good morning Sheila.  I would like

5  to cancel the request to reclassify the position.

6         Did I read that correctly?

7     A.  Yes.

8     Q.   Does that mean that as of February 10th the

9  University had decided to keep Ms. Bernard in her

10  account technician role?

11     A.  I'm just reading the prior emails.

12     Q.  Sure.  Take your time.

13     A.  So, I'm not sure.  I don't know what

14  this -- you know, what was behind her saying that.

15     Q.   Okay.  So, you think Ms. Williams would be

16  the best person to ask specifically about that

17  question?

18     A.  I think so.

19     Q.   What's the difference to the University

20  between reclassifying an existing position and

21  creating a new position?

22     A.  So, when you reclassify, you already have a

23  job and you are going to modify it in some way.  It

24  could be a title change, change of duties.  I would

25  say a competency level change for an SHRA position

*www.NCDepo.com*                    *Depositions, Inc.*
*info@NCDepo.com*              *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN   Document 28-2   Filed 07/07/25   Page 53 of 109

1   but you wouldn't see a competency level change

2   unless the duties had changed and supported a

3   competency level change.  So that's kind of

4   reclassify.

5           Establishing a new position is the position

6   doesn't exist today, it's not funded yet, and

7   you're starting with a brand new position

8   description.

9       Q.  If I may ask this:  From what you just

10  testified to, can you reclassify a position without

11  essentially changing the original position?

12      A.  I don't know why there would be a purpose

13  to reclassify a position.

14      Q.  Okay.

15      A.  Well, you could if, for some reason -- even

16  if you change a job title, that's a change.  Right?

17      Q.  Right.

18      A.  So I would say there has to be some change

19  to warrant going through a reclassification

20  process.

21      Q.  It abolishes the old job and replaces it

22  with a new job; correct?

23      A.  In reclassification?

24      Q.  Yes, ma'am.

25      A.  Not really.

Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 54 of 109

1     Q.  Oh, okay.

2     A.  That's not usually the language that we

3   would use.  The position still exists.  It's a

4   position number that's funded.  Okay?  And you're

5   making adjustments to the position.  Still keeps

6   the same position number in a reclassification.

7     Q.  Got you.

8         Is there anything about creating a new

9   position that requires the abolition or -- let's

10  just say abolition of another position?

11    A.  So there's not a requirement unless funding

12  is needed and you no longer need the previous

13  position.

14    Q.  Got you.  Okay.  Do you see where I'm

15  confused here, though, in the sense that we've gone

16  from reclassifying Ms. Bernard's position, which

17  understandably was her position.  Right?  And we've

18  gone from canceling that request to creating -- to

19  requesting a new position entirely, which in my --

20  my understanding means that Ms. Bernard's position

21  is remaining untouched through these emails;

22  correct?

23        MR. LINDSLEY:  Objection.

24        MR. BUDD:  Is there anything in these

25  emails aside from what we've already discussed that

Case 5:24-cv-00219-BO-RN   Document 26-2   Filed 07/07/25   Page 55 of 109

1   addresses what's going to happen to Ms. Bernard's

2   position?

3               MR. LINDSLEY:  Objection.

4               THE WITNESS:  So, there's not -- it's

5   not clear and directly written in the

6   communications but the February 10th, 2:56 p.m.

7   email from Sheila Wright Zeigler to Ms. Williams,

8   she says it's about establishing a budget analyst

9   one, so what -- what had happened was the

10  University system, which kind of controls what we

11  have the authority to do here with establishing

12  positions, classifying positions, that sort of

13  thing, there was a new -- let me think how to say

14  it.  Positions that -- certain positions, not all

15  positions, in audit business and finance had moved

16  into a new classification that was exempt from the

17  State Human Resources Act.

18  BY MR. BUDD:

19      Q.  Okay.

20      A.  And Ms. Williams had tried to reclassify

21  the accounting technician, is my understanding, and

22  the UNC system said no.  You know.  Not under the

23  rules that we have today, because those

24  positions -- a budget analyst and accounting tech

25  are so significantly different that you need to

Case 5:24-cv-00219-BO-RN     Document 28-2     Filed 07/07/25     Page 56 of 109

1  establish that budget position and conduct a

2  competitive search.

3      Q.  Got you.  Okay.  I think I understand that.

4  Okay.  At what point in time had the University or

5  Ms. Williams in particular decided that

6  Ms. Bernard's position was going to be eliminated?

7      A.  So, I don't know the exact date, but --

8      Q.  Okay.

9      A.  The budget office, in conjunction with the

10 vice chancellor of business and finance had looked

11 at how the budget offices were set up at other

12 campuses in the UNC system and reviewed the

13 positions and I think they had moved into an

14 environment where more was expected and the other

15 campuses had recognized that and were operating

16 with budget analysts and not accounting

17 technicians.

18          So, our budget office, business and finance

19 division felt that was the direction to go.

20          So at some point they decided that they

21 needed three budget analysts and did not need

22 accounting technicians.

23      Q.  Okay.  When -- and your testimony is you

24 don't know when that decision was made?

25      A.  I don't think I know the exact date.

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*         *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 57 of 109

1       Q.  Can you guesstimate or approximate when

2   that decision was made?

3       A.  I would guesstimate that it started -- the

4   decision process started in the fall of 2022.

5       Q.  Okay.  So approximately, like, five months

6   before these February emails?

7       A.  I would say three to five months.  Yes.

8       Q.  Okay.  Do you know if there's anything in

9   writing about that decision making process and that

10  determination?

11      A.  I do not know.

12      Q.  Has the University conducted a search for

13  any documents regarding that decision making

14  process?

15      A.  I think we produced the documents for the

16  class -- for establishing the position, but -- the

17  budget analyst position, which it could be in the

18  justification, because that's part of that process.

19      Q.  Okay.  If I represent to you that I did not

20  see anything -- I did not see anything regarding a

21  big picture conversation of reorganizing the budget

22  office in the document production.

23          Did I miss any documents regarding those

24  conversations?

25          MR. LINDSLEY:  Well, objection.

www.NCDepo.com                   Depositions, Inc.
info@NCDepo.com                Serving all of North Carolina        (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 58 of 109

1  BY MR. BUDD:

2     Q.  Do you know if any documents about a bigger

3  picture reorganization that you just described, do

4  they exist?

5     A.  Beyond the organizational chart that you

6  have included here, I don't know.

7     Q.  Okay.  All right.  Would the University

8  have any objection to conducting further search for

9  documents regarding conversations about the --

10  about the reorganization of the department, the

11  division, in that sense?

12     A.  No.  I mean, I think we can -- we can see

13  what's there, but I will say that, you know, lots

14  of times when these kind of things happen it's

15  conversation in a room and it's not --

16     Q.  Yeah.

17     A.  -- in writing.

18     Q.  Understood.

19     A.  But certainly I can look.

20     Q.  Understood.

21        If you could just turn to the first page of

22  Exhibit 4, please.

23     A.  Okay.

24     Q.  Let me know when you get there.

25     A.  I'm there.

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*        *Serving all of North Carolina*    *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 59 of 109

1    Q.  Very first email, February 10th, 2023 at

2  3:27 email.  Sandra writes hopefully we'll get it

3  right this time.  Looks like there's supposed to be

4  an emoji or something there.  Do you know what was

5  wrong the first couple of times?  Do you know what

6  she's referring to there?

7    A.  I don't absolutely know but if you look at

8  the email just prior, she's saying I no longer want

9  to reclassify any current positions.  She's

10  requesting to establish a new position which she

11  was doing after receiving the feedback from

12  Ms. Sheila Wright Zeigler that it would need to be

13  established as an EHRA position and not SHRA.

14    Q.  Okay.  Thank you.  You can put Exhibit 4 to

15  the side.

16        I'm going to turn to Exhibit 5 now if you

17  can get that.

18    A.  Reduction in force plan?

19    Q.  Yes, ma'am.  Dated March 23rd.

20    A.  Okay.

21    Q.  So does this exhibit appear to be the March

22  23rd, 2023 reduction in force plan?

23    A.  Yes.

24    Q.  And this is the reduction in force plan

25  that resulted in the elimination of Ms. Bernard's

www.NCDepo.com              Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 60 of 109

1   job?

2       A.  Yes.

3       Q.  All right.  Start in the first paragraph,

4   if you could, abolishing the accounting technician

5   position.  I think I've asked this question but

6   again, just for the sake of the record, do you know

7   when it became the plan to abolish Ms. Bernard's

8   position?

9       A.  So, I was pulled into the conversation in

10  February.  So sometime in February, 2023.

11      Q.  Okay.  And were those conversations in

12  person as well or over the phone or verbal?

13      A.  I remember speaking with Ms. Williams in

14  person.

15      Q.  Okay.

16      A.  We may have followed up by phone, but it's,

17  you know, a very sensitive matter, so more than

18  likely --

19      Q.  Understood.

20      A.  -- in person.

21      Q.  Understood.  Okay.  So let's go down to the

22  criteria.  All right?  So this list of criteria is

23  the same list of criteria that's included in the

24  RIF policy I think in Exhibit 2; correct?

25      A.  Yes.

www.NCDepo.com                    Depositions, Inc.
info@NCDepo.com                Serving all of North Carolina         (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 61 of 109

1        Q.  Type of appointment, relative efficiency,

2   actual or potential adverse impact on the diversity

3   of the work force and length of service; correct?

4        A.  Yes.

5        Q.  All right.  So, for each of these factors

6   I'm going to ask you kind of the same questions.

7   Okay?  Let's start with type of appointment.  Did

8   this have any role in defendant's decision to

9   eliminate Ms. Bernard's position?  I'm not asking

10  did they -- did they consider it, because you had

11  to consider it, but did this have any role or play

12  any part in defendant's decision to eliminate the

13  position?

14       A.  The position itself, no.

15       Q.  Okay.  In fact, did the type of appointment

16  that she had, didn't that weigh in Ms. Bernard's

17  favor as a permanent employee?

18       A.  Well, we have -- so there was only one

19  position --

20       Q.  Right.

21       A.  -- subject to reduction in force.  So,

22  there was not a -- you know, her -- any of this

23  really weighing in her favor, it was that specific

24  position.  So there was not a comparison really.

25  Yeah.  So go ahead.

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 62 of 109

1        Q.  The position and Ms. Bernard's role in that

2    position, if -- following the criteria set out in

3    the RIF policy, type of employment should have

4    weighed in Ms. Bernard's favor; correct?

5        A.  Correct.  Yes.

6        Q.  Okay.  All right.  Let's skip ahead because

7    I'm going to get back to relative efficiency.

8    Right?

9        A.  Mm-hmm.

10        Q.  Actual or potential adverse impact on

11    diversity of the work force.

12            I think you testified earlier that age

13    should have been and was a factor to be considered

14    in this; correct?

15        A.  Yes.

16        Q.  So Ms. Bernard's age should have been a

17    positive factor in these criteria; correct?

18        A.  Well, there -- you know, there was only one

19    position.  It turned out there was only one

20    position.  So age became not relevant really,

21    because it's just one person.

22        Q.  Right.  But I'm asking, again, if they had

23    followed -- if the University had followed the

24    criteria and then this would have weighed in her

25    favor; correct?

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 63 of 109

1          MR. LINDSLEY:  Objection.  Injuries.

2          THE WITNESS:  I don't -- I would say

3  that it doesn't -- you know, it's not favorable or

4  unfavorable to her, because we didn't really need

5  to put any emphasis on that.  It was not weighted

6  heavily because it was that position that she was

7  in and there was not -- there was not another place

8  to put her.

9  BY MR. BUDD:

10      Q.  Okay.  Let's go just if you could, go to

11  the second page here.  We got the composition of

12  the effected work force; correct?

13      A.  Yes.

14      Q.  But your testimony is that none of these

15  people were effected because it was just

16  Ms. Bernard; correct?

17      A.  Yes.

18      Q.  Okay.  I think, my understanding of this

19  chart is that these are all of the accounting

20  technicians in the division of business and

21  finance; correct?

22      A.  That is correct.

23      Q.  All right.  My, again, reading of this is

24  that Ms. Bernard was the second oldest employee --

25  second oldest accounting technician.  Am I reading

1  that correctly?

2     A.  That does look correct.  Yes.

3     Q.  Okay.  So given that she was the second

4  oldest accounting technician, wouldn't that have

5  provided her some level of consideration under

6  actual or potential adverse impact on the diversity

7  of the work force criteria?

8     A.  So, not in this case.  And if I can

9  clarify.

10    Q.  Please.

11    A.  So, the reason we prepared -- we followed

12 this template, this is a template process.  The

13 reason we looked across the division of business

14 and finance and not just in the budget office when

15 we did this analysis, the main reason was to

16 determine if we had someone out there who was

17 temporary or probationary and, in which case we

18 would -- oh, if we had a vacant position we were

19 looking for vacancies, too, to see if we should by

20 policy separate another individual because they

21 were probationary, you know, or not career status,

22 probationary or temp -- temporary.

23       So that's really the purpose in why we did

24 this.  We said well we don't want to just look at

25 the budget office, we want to help her if we can,

1  let's look across -- we actually looked across the

2  whole campus.  Turns out all accounting technicians

3  are in the division of business and finance so we

4  just put them all in.

5     Q.  Okay.  Okay.  What I'm -- okay.  I

6  appreciate that.  I think -- I don't think I've

7  gotten an answer to the question though that I'm

8  asking, which is if the -- if the University was

9  supposed to consider all four of these criteria in

10 doing the RIF, I'm kind of thinking it as a

11 positive and negative for each of these criteria.

12 Ultimately, if Ms. Bernard, would her age have been

13 a positive or negative for this criteria?

14         MR. LINDSLEY:  Objection.

15         THE WITNESS:  Yeah.  I see it as

16 irrelevant under the circumstances.

17         MR. BUDD:  Are you saying that the

18 University did not follow this criteria and did not

19 give this consideration?

20         THE WITNESS:  It's there because we

21 have to look at it, but because it was just one

22 position that was -- you know, it became not

23 important.

24         MR. BUDD:  Okay.  If it had been

25 considered would it be positive or negative in her

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 66 of 109

1  favor?

2           MR. LINDSLEY:  Objection.

3           THE WITNESS:  And that's -- yeah.  I

4  mean, it's hard to say, because what -- what would

5  those circumstances have been.

6           MR. BUDD:  Okay.

7           THE WITNESS:  So is she in a protected

8  class?  So yeah.  But it's not relevant in this set

9  of circumstances.

10          MR. BUDD:  Okay.  But that's because

11  she was the only one targeted by this RIF?

12          THE WITNESS:  Correct.

13          MR. LINDSLEY:  Objection.

14  BY MR. BUDD:

15     Q.  Okay.  Last category length of service.

16  Again, going by that chart on page two, Ms. Bernard

17  was the longest tenured accounting technician at

18  the University; correct?

19     A.  Yes.

20     Q.  Okay.  Is it the purpose of the criteria to

21  favor longer tenured employees versus shorter

22  tenured employees?

23     A.  It depends on the circumstances and the

24  other factors.

25     Q.  But the University is supposed to consider

1   the length of an employee's service when making

2   these decisions; correct?

3      A.  That is one of the factors.

4      Q.  Okay.

5      A.  If you're looking more than one position.

6      Q.  Okay.  Is it your testimony that because

7   she was the only employee targeted by this RIF and

8   the only position targeted by this RIF, that the

9   criteria that are listed here are more -- are not

10  relevant to the decision -- the University's

11  decision?

12          MR. LINDSLEY:  Objection.

13          THE WITNESS:  So, this information is

14  laid out because we're required to complete this

15  template.  We could have completed it with just

16  Ms. Bernard's information.  We included everyone

17  because we were looking to see if there was another

18  position that she should go into.

19          MR. BUDD:  Okay.  Right below those

20  four criteria it says relative efficiency was a

21  critical factor in the evaluation process.

22          What does that mean?

23          MR. LINDSLEY:  Sorry, Joe.  Where are

24  you looking?

25          MR. BUDD:  Sorry.  It's the bottom of

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com                Serving all of North Carolina        (910) 557-4640
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 68 of 109

1    page 20 and the top of page 21.

2              MR. LINDSLEY:  Okay.

3    BY MR. BUDD:

4        Q.  Do you see it?

5        A.  Yeah.  So I think we're saying that

6    performance was weighted more heavily than the

7    other factors but again, we couldn't just

8    reclassify her into the position.  There was a new

9    position, she needed to apply for it if she was

10   interested.

11       Q.  Was Ms. Bernard's performance in the

12   accounting technician role relevant to her

13   eligibility for this new position?

14       A.  No.

15       Q.  Was it considered for her eligibility for

16   that new position?

17       A.  It was not, because she did not apply for

18   that new position.

19       Q.  Okay.  So, let me ask you this:  I think --

20   let's go back to your discovery responses.  That's

21   question number three; correct?  Exhibit Number 3.

22   Do you have that in front of you?

23       A.  What page is it?

24       Q.  Let's go to page ten because I'm going to

25   ask you about question thirteen.

1      A.  Okay.

2      Q.  Are you with me?

3      A.  I'm on page ten.

4      Q.  Okay.  So page -- so question thirteen, I

5   asked you -- I asked the University to identify any

6   and all vacant positions with the defendant for

7   which the plaintiff qualified at the time of the

8   termination of her employment.

9         Do you see that?

10     A.  Yes.

11     Q.  And your attorney objected but then without

12  any objections upon information and belief none.

13          So in discovery responses the University

14  has said that there were no eligible -- there were

15  no positions that she qualified for.  Does that

16  include the budget analyst position one that is

17  being created?

18     A.  Can you just repeat your question one more

19  time?

20     Q.  Sure.  My reading of your answer in

21  question thirteen is that there were no positions

22  available to her at the time.  Is that a fair

23  assumption -- fair interpretation of your answer?

24          MR. LINDSLEY:  Objection.

25  )))

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*          *(919) 557-4640*
Case 5:24-cv-00219-BO-RN     Document 28-2     Filed 07/07/25     Page 70 of 109

1  BY MR. BUDD:

2      Q.  There were no vacant positions at the time

3  of plaintiff's termination of her employment that

4  she was qualified for.

5      A.  There were no vacant accounting technician

6  positions, which is the job family, the accounting

7  job family where we would have looked.

8      Q.  Okay.

9      A.  There may have been positions that she was

10  qualified for.  We made the postings, the job

11  openings advertisements available to her.  But the

12  budget positions, budget analyst positions, were

13  not yet posted.  I don't think those were through

14  the establishment process yet.

15      Q.  Okay.  Looking right below, fourteen.

16  Defendant attempted to identify vacant positions

17  and invited plaintiff to apply for the new budget

18  analyst position which plaintiff did not do.

19          Did I read that correctly?

20      A.  I am --

21      Q.  That's all right.  Interrogatory number

22  fourteen.

23      A.  Okay.

24      Q.  I have the benefit of highlighting the

25  parts that I want to ask.

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*        *Serving all of North Carolina*      *(919) 557-4640*
Case 5:24-cv-00219-BO-RN   Document 26-2   Filed 07/07/25   Page 71 of 109

1      A.  Okay.

2           MR. LINDSLEY:  It's on page ten of

3    that document.

4           MR. BUDD:  Yeah.  Right below.

5           MR. LINDSLEY:  Here.

6           THE WITNESS:  Okay.  Yeah.  So right.

7    We attempted to identify vacant positions and her

8    supervisor made her aware that there were going to

9    be -- or there was going to be a budget analyst

10   position.  I don't know if she said a position or

11   positions.

12   BY MR. BUDD:

13     Q.  Okay.  Was Ms. Bernard qualified for the

14   budget analyst one position that was being created?

15     A.  I don't know.

16     Q.  Okay.

17     A.  Because she would have gone through a

18   selection in a sense to determine that.

19     Q.  Okay.  And is that because it's an EHRA

20   position or -- yeah.  Is that because it's an EHRA

21   position?

22     A.  It's an EHRA position and we will do

23   competitive searches for those.

24     Q.  Okay.  Got it.

25           So going back to thirteen then just, I

www.NCDepo.com                Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 72 of 109

1    don't -- yeah.

2         Is that still the testimony of the

3    University today, that there were no open vacant

4    positions with the defendant for which the

5    plaintiff qualified at the termination of her

6    employment?

7         A.  There were no vacant positions that we knew

8    she would be qualified for which would be the

9    accounting positions, accounting technician

10   positions and she had not raised other positions of

11   interest, she had not applied for any other

12   positions.  We don't -- we don't have current

13   resumes for our employees --

14        Q.  Okay.

15        A.  -- it's not part of the process.  So,

16   that's kind of why we tell them you can apply for

17   anything you think you're qualified for and

18   interested in.

19        Q.  Okay.

20        A.  If we don't find a comparable position.

21        Q.  Okay.  And so your testimony though is that

22   the search that the University conducted for

23   comparable positions was to identify the accounting

24   technician positions; correct?

25        A.  Correct.

*www.NCDepo.com*            *Depositions, Inc.*
*info@NCDepo.com*       *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 73 of 109

1      Q.  Was there anything else that they did to

2    identify comparable positions?

3                MR. LINDSLEY:  Objection.

4                THE WITNESS:  I'm not -- I'm not sure

5    if others -- you know, I'm not sure beyond what I

6    said.

7                MR. BUDD:  Okay.  Were there any other

8    positions that the University looked into to place

9    Ms. Bernard in, aside from accounting technician?

10                THE WITNESS:  That she could be

11   directly placed into?

12                MR. BUDD:  Sorry.  Can we go off the

13   record for a second.

14                (A brief recess was taken.)

15   BY MR. BUDD:

16      Q.  Ms. Faircloth, I honestly forget where I

17   was prior to the break, so I apologize.  I'm just

18   going to ask what I think is something that is

19   close to what I was asking prior to the break but

20   if it's not, I apologize.

21          Are there any other positions at the

22   University that the University looked for vacancies

23   on behalf of Ms. Bernard?

24      A.  We looked at accounting technician

25   positions and that is -- you know, anything else in

www.NCDepo.com                 Depositions, Inc.
info@NCDepo.com          Serving all of North Carolina          (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 74 of 109

1   the accounting job family would not have been

2   relevant because we can't move someone into a

3   higher level position.  But I looked, you know, to

4   see -- she was a journey level accounting

5   technician, so we looked at journey level

6   accounting technician and contributing to see if

7   there was an open position that could be filled

8   that we could move her to, and there was not.  And

9   we continued monitoring that but what we did at the

10  time of her notification was to make her aware of

11  where open positions can be found, not only at the

12  University but statewide and that she could, you

13  know, talk to us -- you know, I was in the room

14  with Ms. Williams, if you have questions, to let us

15  know and Ms. Williams, I recall her telling

16  Ms. Bernard that there would be other positions she

17  could apply for.

18      Q.  Okay.  So are there any other positions

19  aside from accounting technician that the

20  University searched for vacancies in, aside from

21  the accounting technician.  I think your answer is

22  no, but I just want to make sure.

23      A.  My answer is no.

24      Q.  Okay.  If we could go back to Exhibit 5 and

25  the first page of Exhibit 5.  I missed a big

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*        *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 75 of 109

1   question I wanted to ask you.

2       A.  Is that reduction --

3       Q.  Yes.

4       A.  -- in force?

5       Q.  Yes, ma'am.  The March 23rd reduction in

6   force for Ms. Bernard.

7       A.  Got it.

8       Q.  The very first sentence, the University is

9   implementing a reduction in force because of

10  material changes in position duties required to

11  support current priorities and business needs.

12          What were the material changes in position

13  duties?

14      A.  The changes went to significantly greater

15  analytical duties, analytical decision making, in

16  terms of working with data.  As opposed to an

17  accounting technician position which is really more

18  data entry, maybe running a standard report that's

19  already developed.

20      Q.  Any other material changes?

21      A.  Well, the position descriptions are

22  significantly different and in bullet points that I

23  would have to be looking at them together to really

24  point that out.

25      Q.  Okay.  So I think your testimony is that

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*      *(919) 557-4640*
Case 3:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 76 of 109

1  the position -- the positions are -- the accounting

2  technician role is more of a data entry job versus

3  the budget analyst which is more of an analytical

4  interpretive position.  Is that a fair description

5  and comparison?

6      A.  Yes.

7      Q.  Okay.  All right.  Did the University

8  consider Ms. Bernard for the administrative support

9  specialist position in the budget office?

10         (Reporter interruption.)

11     A.  No.

12     Q.  Why did they not consider her?

13     A.  Because we looked at the job family that

14  she was in to try to place her in a comparable

15  position.  If that position was open, I'm not sure

16  if it was open at that time, but we did not look at

17  positions in that administrative assistant

18  specialist category.

19     Q.  Okay.  If you -- if you could go back to

20  Exhibit 4, remember that org chart we were looking

21  at?

22     A.  Yes.

23     Q.  It said SHRA 1626.  It says vacant.

24  Correct?

25     A.  It was proposed, so I'm not sure if it was

www.NCDepo.com                    *Depositions, Inc.*
info@NCDepo.com                   *Serving all of North Carolina*            (919) 557-4640
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 77 of 109

1   open at the time of putting the plan together or

2   not.

3       Q.  Okay.  The plan was -- if it wasn't in

4   existence, the plan was, as part of the

5   reorganization, to create an administrative support

6   specialist; correct?

7       A.  That is the way this appears.

8       Q.  Okay.  And it's the University's testimony

9   that Ms. Bernard was not considered for that role;

10  correct?

11      A.  She was not, to the best of my knowledge.

12  She did not apply for that position.

13      Q.  It's an SHRA position; correct?

14      A.  It is.

15      Q.  Did she need to apply as an SHRA position?

16      A.  Well, our practice, our process is that we

17  would have looked only in the job family where her

18  current position was to just place in a position

19  and I don't recall there being any conversation

20  about that position.

21      Q.  Okay.  If she testifies that she asked

22  about this administration support specialist

23  position and asked to be considered for that

24  position, would you disagree with that testimony

25  or --

*www.NCDepo.com*                *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*          *(919) 557-4640*
Case 5:24-cv-00219-BO-RN     Document 26-2     Filed 07/07/25     Page 78 of 109

1      A.  I would disagree.  Yes.

2      Q.  Okay.  And it's your testimony you don't

3   recall her ever expressing interest in that

4   position?

5      A.  Correct.  Yes.

6      Q.  Okay.  All right.  Why is it the University

7   policy to not look for lower demotions, let's just

8   say, in a RIF situation, and present that to the

9   employee?

10     A.  So, I wouldn't say that it's not -- I would

11  say that it's possible, but our practice is to stay

12  within the job family and then from there let the

13  employee explore what they're interested in.  We

14  don't know if that employee meets the requirements

15  for a position, if they're interested in it.  They

16  might be interested because they need a position,

17  but we don't know -- we don't know what all of

18  their skills are.  We just know here's what they've

19  done at the University.  Ms. Bernard in this case

20  had been, you know, just as an example, had been in

21  accounting, accounting clerk and the clerk's became

22  technicians later.  That's really all we know about

23  her work experience.

24     Q.  Ms. Bernard worked for the University for

25  several decades.  Don't you think that would have

1   been enough to understand what her qualifications

2   were and what her skills were?

3               MR. LINDSLEY:  Objection.

4               THE WITNESS:  My answer would be no.

5               MR. BUDD:  Okay.  She spent almost 20

6   years with the University.  So in 20 years the

7   University still couldn't tell what her skills

8   were?

9               MR. LINDSLEY:  Objection.

10              THE WITNESS:  So, she was doing one

11  position and one set of duties.  To know whether

12  she could do another position and another set of

13  duties, we -- no one would have observed that.

14  BY MR. BUDD:

15      Q.  And is it the University's position that

16  not considering lower level positions outside of

17  that family, that would still satisfy the policy's

18  requirement that it engage in a systematic

19  consideration of actions?

20      A.  That is my understanding, that we're, you

21  know, following the policy.  It's consistent with

22  what we've done.

23      Q.  Okay.  Going back to Exhibit 2.  Exhibit 5.

24  I'm getting all confused.  Exhibit 5.  Page 21.

25  It's the second page of that exhibit.  Let me know

Case 5:24-cv-00219-BO-RN     Document 28-2     Filed 07/07/25     Page 80 of 109

1   when you're there.

2      A.  This is the reduction in force plan?

3      Q.  Yes, ma'am.

4      A.  Okay.  Got it.

5      Q.  All right.  For the March 23rd; right?

6      A.  Yes.

7      Q.  It says alternatives to layoff.  Throughout

8   this process we will continue to look for positions

9   within the agency and in other agencies to avoid

10  the involuntary separation of the employee.

11         What other agencies did the University look

12  at to avoid the involuntary separation of

13  Ms. Bernard?

14     A.  We did not look at other agencies.  We

15  provided her -- I provided her the job -- the link

16  to the state job postings.

17     Q.  Okay.  So the University did not look for

18  positions within other agencies --

19     A.  No, sir.

20     Q.  -- to avoid the involuntary?

21     A.  No.

22     Q.  Okay.  I am almost done here, ma'am.  If

23  you could, Exhibit 6 that I emailed to you last

24  night.  I will represent to you that this was

25  again -- this was actually better than a Google

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*        *Serving all of North Carolina*      *(919) 557-4640*
Case 5:24-cv-00219-BO-RN   Document 26-2   Filed 07/07/25   Page 81 of 109

1    search.  I went on Fayetteville State University's

2    staff directory and searched for all employees of

3    the budget office and these are the four

4    individuals who were the results.

5           Does that appear to be what this Exhibit 6

6    is?

7       A.  It looks very outdated.

8       Q.  Okay.

9       A.  And -- I mean, it stands out to me that

10   there are two names with the same position title

11   that I do not believe that department has.

12      Q.  You've anticipated my questions.  So yeah.

13   Go ahead.  I'm sorry.

14      A.  And Ms. Wells, I'm not sure how long ago

15   you did your Google search.  Ms. Wells is not in an

16   accounting technician position.

17      Q.  I'll represent to you that this was last

18   night.

19      A.  Yeah.  So it's pulling in old information.

20      Q.  Okay.  Is it safe to say though that

21   Jan-Jee Wells at one point in time was an

22   accounting technician with the budget office?

23      A.  She was.

24      Q.  Okay.  Do you know if she was hired before

25   or after Ms. Bernard was terminated?

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 82 of 109

1    A.  She was -- she was working with

2   Ms. Bernard.  Yes.  So she was here.

3    Q.  Okay.  According to the chart, at the time

4   of the chart in Exhibit 4, she was listed as a

5   finance and budget analyst three, do you know when

6   Ms. Wells was an accounting technician?

7    A.  I think it was prior to October, 2022.

8    Q.  Okay.  So she was promoted into this -- or

9   into the finance and budget analyst position?

10    A.  Yes.  She applied for that position, was

11   selected and promoted into the job.

12    Q.  Okay.  Do you know if Ms. Wells is older or

13   younger than Ms. Bernard?

14    A.  I do not know.

15    Q.  So then I think you also referenced or --

16   Natalie Blanchard and Jasmine Miller are both

17   listed here as administrative support specialists.

18    A.  Mm-hmm.

19    Q.  Do you know if they are still in that

20   position?

21    A.  I believe that position is vacant.

22    Q.  Okay.  It's currently vacant?

23    A.  I'm not sure.  I think so.  Yeah, but I

24   don't think -- I don't think either -- well, I know

25   that Ms. Blanchard is not in that position.  I

1   don't know about Jasmine Miller though.

2       Q.  Okay.  Do you know if either of them are

3   older or younger than Ms. Bernard?

4       A.  I am not sure of their ages.

5       Q.  If you had to guess, for Ms. Blanchard,

6   Ms. Miller and Ms. Wells, do they all appear to be

7   younger than Ms. Bernard?

8           MR. LINDSLEY:  Objection.

9           THE WITNESS:  So, I -- honestly, if

10  they all three walked in the room right now,

11  there's only one of them who I would know the name

12  and face.

13  BY MR. BUDD:

14      Q.  Okay.

15      A.  And I do not know ages.

16      Q.  Do you know when Jasmine Miller and Natalie

17  Blanchard were hired for the administrative support

18  specialist positions?

19      A.  I know when Natalie Blanchard was hired.

20  She was hired in I think -- I think she started

21  that position in May 20 --

22      Q.  May of what?

23      A.  2023.

24      Q.  Okay.  Thank you.

25          What about Ms. Jasmine?

*www.NCDepo.com*              *Depositions, Inc.*
*info@NCDepo.com*          *Serving all of North Carolina*        *(919) 557-4640*
Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 84 of 109

1      A.  I'm not certain about her.

2      Q.  Okay.  Do you think it was after Ms.

3  Blanchard?

4      A.  I'm thinking probably yes, just because of

5  that, you know, org chart, the position was vacant

6  but I am not -- I am not a hundred percent certain

7  but I'm thinking probably yes, after.

8      Q.  Okay.  Ma'am, if you could just oblige me

9  for two minutes, I think I'm done, but I want to

10  just make sure.  I'm going through my notes, if we

11  could go off the record and Mr. Lindsley might have

12  some questions for you as well.  But hold on.

13            (A brief recess was taken.)

14            MR. BUDD:  Ms. Faircloth we just took

15  a short break.  Is there anything in your previous

16  answers that you'd like to change or add on to?

17            THE WITNESS:  No.

18            MR. BUDD:  Thank you so much for your

19  time this morning.  I have no further questions.

20  Again, Mr. Lindsley might have some follow-up.

21            MR. LINDSLEY:  I have no questions to

22  follow up.

23            (The deposition concluded at 12:36

24  p.m.)

25

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 85 of 109

1    STATE OF NORTH CAROLINA

2    COUNTY OF WAKE

3                    CERTIFICATE

4            I, Ann Marie Agranoff, a Notary Public in

5    and for the State of North Carolina duly

6    commissioned and authorized to administer oaths and

7    to take and certify depositions, do hereby certify

8    that on March 10, 2025, JULIA KATHERINE FAIRCLOTH,

9    being by me personally duly sworn to tell the

10   truth, thereupon testified as above set forth as

11   found in the preceding pages, this examination

12   being reported by me verbatim and then reduced to

13   typewritten form under my direct supervision; that

14   the foregoing is a true and correct transcript of

15   said proceedings to the best of my ability and

16   understanding; that I am not related to any of the

17   parties to this action; that I am not interested in

18   the outcome of this case; that I am not of counsel

19   nor in the employ of any of the parties to this

20   action.

21           IN WITNESS WHEREOF, I have hereto set my

22   hand.

23

24   _____

25           Ann Marie Agranoff
             Notary Public

Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 86 of 109

## Exhibits

**Exhibit 1** 3:9 9:17

**Exhibit 2** 3:10 19:1,12,13,16 21:15 22:6 23:3 38:2 60:24 79:23

**Exhibit 3** 3:10 42:1 43:12 68:21

**Exhibit 4** 3:11 43:20 50:24 58:22 59:14 76:20 82:4

**Exhibit 5** 3:11 59:16 74:24,25 79:23,24

**Exhibit 6** 3:12 80:23 81:5

**Exhibit 7** 3:12

## 0

**000090** 50:19

## 1

**1** 9:17

**10th** 43:24 52:3,8 55:6 59:1

**12:36** 84:23

**1626** 76:23

**1989** 14:25

**1st** 45:5,19 47:6

## 2

**2** 19:1,13,16 21:15 22:6 23:3 38:2 60:24 79:23

**20** 68:1 79:5,6 83:21

**2021** 19:10

**2022** 57:4 82:7

**2023** 43:24 44:7,14 45:5,19 50:14 51:2 59:1,22 60:10 83:23

**21** 68:1 79:24

**23rd** 59:19,22 75:5 80:5

**24th** 44:7

**27** 15:8

**2:56** 55:6

## 3

**3** 42:1 43:12 68:21

**30(b)(6)** 8:12 9:14,18

**3:27** 59:2

## 4

**4** 33:10,11 43:20 50:24 58:22 59:14 76:20 82:4

## 5

**5** 59:16 74:24,25 79:23,24

## 6

**6** 80:23 81:5

## 7

**7** 19:10

**7th** 50:14 51:2

## 9

**9:36** 52:3

## A

**ability** 5:8,12

**abolish** 24:4 60:7

**abolished** 47:7

**abolishes** 53:21

**abolishing** 24:25 60:4

**abolishment** 23:14

**abolition** 54:9,10

**absolutely** 59:7

**accordance** 18:5,22

**account** 52:10

**accountable** 17:25 18:21

**accounting** 28:17 47:5,17 48:2,7 49:20 50:3 55:21,24 56:16,22

60:4 63:19,25 64:4 65:2 66:17 68:12 70:5,6 72:9,23 73:9,24 74:1,4,6,19,21 75:17 76:1 78:21 81:16,22 82:6

**Act** 35:15 55:17

**action** 37:2

**actions** 34:15,25 36:20,23 37:23 79:19

**actual** 33:3 34:5 61:2 62:10 64:6

**add** 28:25 41:22 84:16

**added** 43:14

**addition** 4:21

**additional** 42:23 43:4

**address** 42:25

**addressed** 42:24 51:12

**addresses** 55:1

**adjustments** 54:5

**admin** 48:10

**administering** 17:25 18:21

**administration** 17:21 46:1 47:16,24 48:1,3,15,20 49:1,10 77:22

**administrative** 48:5 76:8,17 77:5 82:17 83:17

**advanced** 49:20 50:4

**adverse** 33:3,10 34:6 41:11 61:2 62:10 64:6

**advertisements** 70:11

**affairs** 38:10

**age** 33:16,22 34:2,4 62:12,16,20 65:12

**agencies** 17:24 80:9,11,14,18

**agency** 29:10 33:9 37:19 39:3 80:9

**agency's** 19:9

**ages** 83:4,15

**agree** 6:3 18:20 21:13,20 22:5 34:4

**agreed** 8:19

**ahead** 42:25 49:13 61:25 62:6 81:13

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 87 of 109

**allowed** 31:1,15

**alternatives** 80:7

**amended** 9:13,18 43:14

**American** 15:13

**analysis** 28:20 30:5 38:21 41:11 46:17 64:15

**analyst** 45:23 47:8 49:20 50:20, 24 55:8,24 57:17 69:16 70:12,18 71:9,14 76:3 82:5,9

**analysts** 56:16,21

**analytical** 28:22 75:15 76:3

**analyzed** 33:8

**Angel** 6:9 12:23

**answering** 5:16 7:14

**answers** 6:23 40:14 42:16 84:16

**anticipated** 81:12

**anticipating** 7:10

**anticipation** 13:2

**anymore** 23:22

**apologize** 20:19 42:18 43:18 73:17,20

**appears** 47:3 77:7

**applicable** 21:1

**applicants** 20:7

**applied** 33:12 72:11 82:10

**apply** 68:9,17 70:17 72:16 74:17 77:12,15

**appointment** 61:1,7,15

**approval** 39:19 41:8

**approvals** 39:22

**approved** 16:23 40:25

**approves** 40:21

**approximate** 57:1

**approximately** 57:5

**area** 16:19 27:5 30:5,15 34:6

**aspects** 17:25 18:21

**assignment** 18:2

**assistant** 46:19 76:17

**associate** 8:23 46:16,20

**assumption** 69:23

**attachments** 44:5

**attempted** 70:16 71:7

**attendance** 29:19

**attended** 13:13 14:10

**attorney** 4:13 6:10 12:17 69:11

**attorneys** 11:19 14:22

**audit** 55:15

**authority** 8:16 55:11

**avoid** 33:10 34:15 36:20 37:7,10, 24 80:9,12,20

**avoiding** 34:12

**aware** 5:15 8:10,15 17:19 18:7 26:7 35:25 37:11 38:16 41:14 51:1,10,13,24 71:8 74:10

### B

**Bachelor's** 13:15,16

**back** 43:8 44:11,14,18,19 62:7 68:20 71:25 74:24 76:19 79:23

**based** 29:17 31:11 33:9 51:20

**basically** 35:13 47:7

**basis** 42:15

**behalf** 8:13,16 9:1,4,7 10:7,18 73:23

**behavior** 29:19

**belief** 69:12

**benefit** 70:24

**benefits** 16:3 18:3

**Bernard** 4:14 8:1,2 24:19 49:8 50:3,8 52:9 63:16,24 65:12 66:16 71:13 73:9,23 74:16 75:6 76:8 77:9 78:19,24 80:13 81:25 82:2, 13 83:3,7

**Bernard's** 10:22 19:17,21 27:18 28:6,15 47:2 50:20 51:3,9 54:16, 20 55:1 56:6 59:25 60:7 61:9,16 62:1,4,16 67:16 68:11

**big** 38:2 57:21 74:25

**bigger** 58:2

**bind** 8:17

**bit** 29:8 36:23 43:18 46:22 49:22

**black** 27:11

**Blanchard** 82:16,25 83:5,17,19 84:3

**bold** 45:8

**bottom** 19:5 48:10 52:4 67:25

**box** 47:24 48:1

**boxes** 45:7,10

**brand** 53:7

**break** 6:17,21 40:8,13 73:17,19 84:15

**bring** 26:20

**bringing** 48:9

**brings** 46:22

**Budd** 4:8,13 21:25 22:4,14,18,23 27:20 32:8,12,22 40:11 42:18 43:2,8,9 54:24 55:18 58:1 63:9 65:17,24 66:6,10,14 67:19,25 68:3 70:1 71:4,12 73:7,12,15 79:5,14 83:13 84:14,18

**budget** 28:10,16 45:4,21,23 47:7 49:3,18,20 50:19,24 55:8,24 56:1, 9,11,16,18,21 57:17,21 64:14,25 69:16 70:12,17 71:9,14 76:3,9 81:3,22 82:5,9

**budgets** 46:16

**bullet** 23:13 24:22 75:22

**business** 13:14 49:18 55:15 56:10,18 63:20 64:13 65:3 75:11

### C

**campus** 40:22,23 65:2

**campuses** 56:12,15

**cancel** 52:5

**canceling** 54:18

**capital** 45:8

**career** 36:10,15 64:21

**careful** 48:14

**Carolina** 13:14 17:14

**case** 4:20 5:24 17:7 64:8,17

www.NCDepo.com
info@NCDepo.com

*Depositions, Inc.*
*Serving all of North Carolina*

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 88 of 109

78:19

**categories** 29:20

**category** 24:20 33:22 66:15
76:18

**certifications** 14:7

**cetera** 26:22 41:6

**chain** 44:5,13

**chance** 13:2

**chancellor** 38:8 39:1,12,16,22
40:2 41:6 46:19,20 56:10

**chances** 21:22 22:7,20

**change** 16:2 17:3 26:22 32:3
40:13 41:23 46:10,11,19 49:21
52:24,25 53:1,3,16,18 84:16

**changed** 15:21 16:1,25 43:5,14
45:14 46:15 53:2

**changing** 53:11

**characterization** 48:20

**charge** 31:9 38:3,6

**chart** 44:24,25 45:3,6,19 47:1,9,
11,14 51:21 58:5 63:19 66:16
76:20 82:3,4 84:5

**checklist** 38:22 41:12

**chronologically** 51:8

**circumstance** 24:5

**circumstances** 65:16 66:5,9,23

**circumvent** 29:11

**clarification** 41:1

**clarify** 37:6 40:16 49:7 64:9

**class** 57:16 66:8

**classification** 18:2 27:1 55:16

**classifying** 55:12

**clean** 7:5,16,23

**clear** 7:23 25:12 29:2 55:5

**clerical** 48:17 49:4

**clerk** 78:21

**clerk's** 78:21

**client** 8:2

**close** 73:19

**commitment** 18:17

**committed** 17:20

**communications** 55:6

**companies** 15:10

**company** 15:4,9,11,12

**comparable** 35:11,18 72:20,23
73:2 76:14

**compare** 23:22 36:6

**comparison** 30:23 61:24 76:5

**compensation** 18:2 27:1

**competencies** 25:17

**competency** 35:17 52:25 53:1,3

**competitive** 56:2 71:23

**complete** 10:10 67:14

**completed** 32:20 67:15

**compliance** 38:4,7,12

**comply** 21:21 22:6 33:21

**components** 11:5

**composition** 63:11

**computer** 25:20

**concluded** 84:23

**conditions** 18:4

**conduct** 10:10 19:14,23 56:1

**conducted** 57:12 72:22

**conducting** 58:8

**confused** 54:15 79:24

**conjunction** 38:25 56:9

**consequences** 20:14

**consideration** 34:18,25 36:20
64:5 65:19 79:19

**considerations** 34:14

**considered** 30:14 31:2 35:18
62:13 65:25 68:15 77:9,23

**consistent** 18:12 79:21

**consultation** 26:14 38:17

**continue** 44:17 80:8

**continued** 74:9

**contributing** 74:6

**controls** 55:10

**conversation** 7:8 57:21 58:15
60:9 77:19

**conversations** 7:8 51:1 57:24
58:9 60:11

**convey** 47:4

**copied** 44:16

**corporate** 8:12

**correct** 8:13 18:14 22:16 29:24,
25 31:3,4,7 32:25 33:23 39:8,13,
20,21 42:21,23 45:24 49:10
50:21,22 53:22 54:22 60:24 61:3
62:4,5,14,17,25 63:12,16,21,22
64:2 66:12,18 67:2 68:21 72:24,
25 76:24 77:6,10,13 78:5

**correctly** 33:14 34:16 52:6 64:1
70:19

**counsel** 39:19

**couple** 15:16 40:17 59:5

**courses** 13:19,22 14:15,18,20,21

**courthouse** 4:24

**create** 26:2 77:5

**created** 69:17 71:14

**creating** 52:21 54:8,18

**criteria** 60:22,23 62:2,17,24 64:7
65:9,11,13,18 66:20 67:9,20

**critical** 67:21

**current** 45:4 49:19 59:9 72:12
75:11 77:18

**cut** 30:21

## D

**data** 75:16,18 76:2

**date** 56:7,25

**dated** 43:23 44:6 50:13 59:19

**day** 28:6,14 36:4

**days** 52:2

**dealing** 20:22

**deals** 20:14

**decades** 78:25

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 89 of 109

**decent** 40:7

**decided** 52:9 56:5,20

**decides** 24:4

**decision** 24:9,14 28:21 34:13 56:24 57:2,4,9,13 61:8,12 67:10, 11 75:15

**decisions** 33:7 67:2

**defendant** 8:6 9:19 19:13,22 44:5 69:6 70:16 72:4

**defendant's** 42:2 61:8,12

**defending** 12:8

**defense** 12:16

**define** 27:7 28:13

**definition** 26:5 27:12,17 28:1,4, 5,8,25

**degree** 13:14,23,24

**demographics** 38:21

**demote** 29:12

**demotions** 78:7

**department** 24:6 26:9 28:16 32:2,13 58:10 81:11

**departments** 17:24

**depends** 12:5 22:12 26:18 66:23

**depict** 47:1

**deposition** 4:17 6:24 9:14,18 11:8 12:8 13:3 43:12 47:21 84:23

**describe** 35:4

**description** 48:23 49:6 50:18,23 53:8 76:4

**descriptions** 75:21

**design** 47:16

**designated** 8:11 16:19

**designed** 34:15

**designee** 8:12

**details** 4:21 28:9 38:19 48:25 49:6

**determination** 31:2 57:10

**determine** 11:14 16:19 32:14 33:8 64:16 71:18

**determines** 31:16,22

**developed** 75:19

**difference** 30:20 52:19

**direct** 31:13,24

**direction** 56:19

**directly** 16:8 34:21 48:11 55:5 73:11

**director** 8:23

**directory** 81:2

**disagree** 77:24 78:1

**disciplinary** 29:11,13,16,18

**discipline** 29:19

**discovery** 13:8 42:11 68:20 69:13

**discrimination** 34:2

**discussed** 21:9 54:25

**discussing** 51:23

**discussion** 43:7

**discussions** 51:2

**dismissal** 18:1

**diversity** 61:2 62:11 64:6

**division** 24:7,10,13 49:18 56:19 58:11 63:20 64:13 65:3

**document** 9:23 42:24 44:2 57:22 71:3

**documentation** 10:16 39:5 41:3,10

**documents** 11:15 13:6 42:4 47:13 51:21 57:13,15,23 58:2,9

**draft** 32:25

**due** 49:21

**duly** 4:5

**duties** 15:21 25:3 26:4,24 28:18 31:17 36:13 49:21 52:24 53:2 75:10,13,15 79:11,13

**duty** 16:14

**E**

**earlier** 37:15,20 62:12

**education** 13:11,17

**EEO** 14:22 18:5,23

**EEOC** 14:15,19,21

**effect** 28:15

**effected** 63:12,15

**effective** 19:10

**efficiency** 30:7,9,13,25 61:1 62:7 67:20

**EHRA** 59:13 71:19,20,22

**eleven** 34:9

**eligibility** 68:13,15

**eligible** 69:14

**eliminate** 37:3 61:9,12

**eliminated** 35:7 37:6 56:6

**elimination** 36:24 59:25

**email** 43:23 44:4,6,13 50:13 51:16 52:3 55:7 59:1,2,8

**emailed** 80:23

**emails** 52:11 54:21,25 57:6

**emoji** 59:4

**emphasis** 63:5

**employ** 25:8

**employed** 15:14

**employee** 16:3 18:13 20:6 29:12, 23 31:14 33:11 35:24 36:9 37:12, 13 61:17 63:24 67:7 78:9,13,14 80:10

**employee's** 31:9 67:1

**employees** 16:8 21:16 22:16 30:12,17,18,24 33:21 37:18 66:21,22 72:13 81:2

**employment** 14:7,11 18:1,4 62:3 69:8 70:3 72:6

**end** 7:15

**engage** 36:19 79:18

**entire** 41:10

**entry** 75:18 76:2

**environment** 56:14

**equitable** 17:23

**essentially** 36:5 49:23 53:11

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 90 of 109

**establish** 56:1 59:10

**established** 46:9 59:13

**establishing** 53:5 55:8,11 57:16

**establishment** 70:14

**estimate** 11:24

**evaluating** 34:5 40:3

**evaluation** 32:20,23,25 67:21

**event** 7:21

**exact** 56:7,25

**EXAMINATION** 4:7

**examined** 4:5

**exempt** 55:16

**exhibit** 9:17 10:1,5 19:1,12,16
21:15 22:6 23:3 38:2 42:1 43:12,
20 44:19 50:24 58:22 59:14,16,21
60:24 68:21 74:24,25 76:20
79:23,24,25 80:23 81:5 82:4

**exist** 45:13 53:6 58:4

**existence** 77:4

**existing** 52:20

**exists** 54:3

**expected** 56:14

**expenses** 37:10

**experience** 25:13 36:18 78:23

**explicitly** 50:7

**explore** 78:13

**Express** 15:13

**expressing** 78:3

**extent** 10:15 11:3

---

**F**

**face** 83:12

**facilitate** 37:18

**fact** 61:15

**factor** 30:14 31:2 62:13,17 67:21

**factors** 30:24 61:5 66:24 67:3
68:7

**fair** 9:11 12:14 17:23 41:6 48:19
69:22,23 76:4

**Faircloth** 4:4,6,10 8:10 13:10
17:12 40:12 43:10 44:12 73:16
84:14

**fairly** 21:16 50:1

**fall** 24:19 57:4

**falls** 25:13 26:25

**familiar** 11:4 17:16 18:7,9

**familiarity** 9:9

**family** 35:13,22 36:8 70:6,7 74:1
76:13 77:17 78:12 79:17

**favor** 61:17,23 62:4,25 66:1,21

**favorable** 63:3

**Fayetteville** 6:10 8:7,13 9:19
11:16 12:24 13:7 41:20 48:16
81:1

**February** 43:24 44:14 50:13 51:2
52:3,8 55:6 57:6 59:1 60:10

**federal** 18:5,22 34:1

**feedback** 59:11

**fell** 24:21

**felt** 56:19

**fewer** 27:13

**field** 14:24

**fifteen** 19:5

**filled** 47:5 74:7

**finance** 49:18 55:15 56:10,18
63:21 64:14 65:3 82:5,9

**financial** 46:16

**find** 36:2,3 46:5,7 72:20

**fine** 4:11

**flip** 49:12,13

**flipping** 44:11,18

**flow** 44:24

**focus** 28:20 42:19

**follow** 22:19,20 65:18 84:22

**follow-up** 84:20

**force** 11:14 16:11,14,25 17:6,10
18:3,22 19:2,10,14,17,21,23 20:1,
5,7,12,15 21:1,5,11,14,18 29:4
30:16 33:7 34:22 59:18,22,24
61:3,21 62:11 63:12 64:7 75:4,6,9
80:2

**forces** 38:16

**forget** 73:16

**forgiveness** 7:21

**formal** 37:21

**forward** 39:20 44:19

**found** 74:11

**fourteen** 70:15,22

**front** 4:24 7:22 9:17,21 19:1,6
42:1 43:19 68:22

**FSU** 8:6 9:1,4 10:10

**full** 49:17

**fully** 5:20,22 6:5 7:14 23:7

**funded** 53:6 54:4

**funding** 17:6 54:11

---

**G**

**gel** 30:13

**give** 4:21 65:19

**goal** 30:13

**goals** 33:9

**good** 4:9 52:4

**Google** 48:14 80:25 81:15

**Googled** 48:14,15

**gosh** 12:1

**govern** 19:22 20:11 21:11

**governed** 19:13

**governing** 19:9

**governs** 21:5

**grab** 6:14

**graduate** 13:18

**grammar** 49:22

**graphic** 47:15

**great** 6:22

**greater** 75:14

**Greensboro** 13:21

**guess** 12:3 25:21 36:25 83:5

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 91 of 109

guesstimate 57:1,3

guideline 34:23

guidelines 33:11

guilty 7:19

---

## H

half 15:8 30:21

handed 21:14

handled 9:9 16:6

happen 24:13,16 25:12 33:1 55:1 58:14

happened 24:18 55:9

happening 38:19 47:2

happy 5:25

hard 66:4

hate 44:10

head 24:10,13 32:3,13 38:5,15,23 39:3,9,23 40:3

heads 26:9

hear 23:8

heard 39:8

heavily 63:6 68:6

hey 26:22

high 39:2

higher 16:23 24:7 26:2 28:17 46:22 74:3

highlighted 50:18

highlighting 70:24

hired 15:19,22 81:24 83:17,19,20

hiring 18:1 35:24

history 13:11

hold 7:13 84:12

honest 5:21

honestly 22:12 43:2 73:16 83:9

hosted 14:18,20

hours 11:25 12:4,10,13,17

housekeeping 43:18

human 8:23 9:9 14:7,24 17:13,

16,19,22 18:13,17 26:15,25 33:20,22 35:15 38:5,15,24 39:9, 23 40:2 41:7 55:17

hundred 84:6

---

## I

identify 32:3 69:5 70:16 71:7 72:23 73:2

immediately 37:22

impact 33:3,8,10 34:6 41:11 61:2 62:10 64:6

impacted 20:6 30:15 36:11,16 38:20,21

impetus 31:5

implement 34:13

implementation 17:21

implementing 75:9

important 65:23

include 12:6 36:24 69:16

included 12:5 33:16 34:5 58:6 60:23 67:16

including 18:1 30:25

incomplete 42:12

incorrect 42:11

increase 21:21 22:7,20

independent 28:21

individual 25:18 26:9 48:22 64:20

individuals 25:18 38:11 81:4

inform 39:3

information 38:23 67:13,16 69:12 81:19

Injuries 63:1

inkling 9:3

inside 14:4

instance 7:4

insure 21:16 33:22 38:12

insuring 17:21 38:3,6

intend 5:7 6:14

intended 29:23 30:11

intention 47:10

interest 72:11 78:3

interested 68:10 72:18 78:13,15, 16

interfere 5:8,12

interpretation 69:23

interpretive 76:4

interrogatories 42:3

interrogatory 42:19,20 70:21

interrupt 25:19,22

interrupting 7:9

interruption 76:10

intrusive 5:6

investigation 10:10,14,18

invited 70:17

involuntary 80:10,12,20

involved 16:11

involvement 16:17 38:17

irrelevant 65:16

issued 17:13

issues 31:24

---

## J

Jan-jee 81:21

January 14:25 44:6

Jasmine 82:16 83:1,16,25

Jeremy 6:8,9,14

jerk 7:3

job 6:22 14:5 15:21 16:13 18:2 20:8 26:3 30:19 35:9,13,22 36:7, 11,12,13,16 50:18,23 52:23 53:16,21,22 60:1 70:6,7,10 74:1 76:2,13 77:17 78:12 80:15,16 82:11

jobs 36:1,2

Joe 4:13 42:14 67:23

journey 74:4,5

judge 4:24

**Julia** 4:4,6

**jury** 4:25

**justification** 32:5,15 57:18

**K**

**Kate** 44:12

**Katherine** 4:4,6

**kind** 24:21 25:5 30:24 37:6 38:21 40:21 41:9 53:3 55:10 58:14 61:6 65:10 72:16

**knew** 72:7

**knowledge** 43:13,16 51:25 77:11

**knowledgeable** 9:12

**L**

**laid** 67:14

**language** 23:8 54:2

**law** 14:8,11

**laws** 18:5,23 34:1

**lawsuit** 4:14 12:9

**layoff** 34:15 80:7

**lead** 24:25

**leader** 16:19

**leadership** 27:14

**learn** 36:11,13

**learning** 14:4

**left** 26:8

**legal** 38:10 39:3,19 41:1

**legs** 40:8

**length** 61:3 66:15 67:1

**letters** 45:8

**level** 13:18 24:7,11,12 26:2 28:18 35:17,23 39:2,15 46:23 52:25 53:1,3 64:5 74:3,4,5 79:16

**levels** 16:23

**lieu** 47:7

**limitations** 47:21

**limited** 36:24

**Lindsley** 21:24 22:10,22 27:19 32:7,17 42:14,22 54:23 55:3 57:25 63:1 65:14 66:2,13 67:12, 23 68:2 69:24 71:2,5 73:3 79:3,9 83:8 84:11,20,21

**link** 80:15

**Lisa** 4:14 7:25 8:2

**list** 60:22,23

**listed** 9:25 10:5 37:25 67:9 82:4, 17

**located** 18:10

**logical** 18:11

**logically** 22:20

**long** 14:23 15:7,14 81:14

**longer** 17:7 28:16 54:12 59:8 66:21

**longest** 66:17

**looked** 56:10 64:13 65:1 70:7 73:8,22,24 74:3,5 76:13 77:17

**loss** 17:5 23:18,23

**lot** 22:13

**lots** 58:13

**love** 23:8 40:24

**low** 29:23,24 30:12

**lower** 24:12 35:22 78:7 79:16

**M**

**made** 24:9 46:10 56:24 57:2 70:10 71:8

**main** 64:15

**major** 17:2,8

**make** 6:24 7:4 24:13 35:24 36:1 41:5 74:10,22 84:10

**making** 28:21 54:5 57:9,13 67:1 75:15

**mandates** 33:21

**manner** 21:17

**manual** 17:13,17,20 18:13,18 33:21

**marathon** 6:16

**March** 45:5,19 47:6 59:19,21 75:5 80:5

**marked** 9:17 19:5

**Master's** 13:15

**material** 23:18 24:24 25:3,14 26:6 27:7 28:2,13 31:17 32:3 75:10,12,20

**materials** 18:10

**matter** 44:6 60:17

**means** 6:4 23:20 26:6 34:20 54:20

**medication** 5:8,11

**meets** 78:14

**mentioned** 20:20 33:19 37:20

**met** 11:14,19

**microphone** 6:15

**middle** 6:19 49:24

**Miller** 82:16 83:1,6,16

**mind** 17:3 40:6 44:19

**minute** 42:13

**minutes** 40:9 43:11 84:9

**missed** 51:5,11 74:25

**Mm-hmm** 30:22 62:9 82:18

**modified** 49:22

**modify** 25:11 52:23

**monitoring** 74:9

**months** 15:17 57:5,7

**morning** 4:9,13 11:12 12:9 52:4 84:19

**move** 50:10 74:2,8

**moved** 55:15 56:13

**moving** 33:2 35:10

**N**

**names** 81:10

**Natalie** 82:16 83:16,19

**nature** 12:18

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 93 of 109

neat 7:16

necessarily 7:1 12:8

needed 28:16,17,23 30:20 38:17 54:12 56:21 68:9

negative 65:11,13,25

night 80:24 81:18

nodding 7:1

non-discriminatory 21:17

non-personnel 37:10

North 13:13 17:13

notarized 42:8

note 6:3 9:16 42:8

notes 84:10

notice 9:14,18 10:11

notification 74:10

notified 35:25

number 46:7 54:4,6 68:21 70:21

numerous 20:25

nutshell 34:20

## O

oath 4:23 5:3

object 42:15

objected 69:11

objection 21:24 22:10,22 27:19 32:7,17 54:23 55:3 57:25 58:8 63:1 65:14 66:2,13 67:12 69:24 73:3 79:3,9 83:8

objections 69:12

obligation 5:3

oblige 84:8

observed 79:13

occur 16:21 31:3

October 19:10 82:7

office 9:9 26:15 28:10 38:10 39:4 41:2,8 45:5,21 49:3,19 56:9,18 57:22 64:14,25 76:9 81:3,22

offices 56:11

Oftentimes 7:8

older 82:12 83:3

oldest 63:24,25 64:4

one-off 13:22

open 35:12 36:3 72:3 74:7,11 76:15,16 77:1

openings 20:8 48:16 70:11

operating 56:15

opportunity 11:8

opposed 16:8 75:16

options 16:21 34:21

order 36:15

org 51:21 76:20 84:5

organization 8:17 24:25 25:4 26:25 27:9,24 31:18 44:25 45:2,5 51:23

organizational 58:5

organizations 14:3

original 53:11

outdated 81:7

outlines 20:6

overlap 24:1

## P

p.m. 55:6 84:24

packet 16:22 42:7

pages 19:5 49:13

paperwork 41:19

paragraph 49:17,24 60:3

part 57:18 61:12 72:15 77:4

participate 10:13

participated 10:17

parts 70:25

party 51:11

past 39:6

pay 21:3 35:14

payment 41:12

people 7:8 26:21 30:19 36:7 63:15

percent 84:6

perform 26:4

performance 29:17,18 31:10,12, 25 32:4,15,20,23,25 68:6,11

performing 29:23,24 30:12

period 12:2

permanent 61:17

person 9:12 21:22 22:7 26:3 31:15,20,22,24 32:16 35:9,10,17 36:10,14,16 51:18 52:16 60:12, 14,20 62:21

personal 13:11

personnel 19:14

phone 60:12,16

picture 38:2 57:21 58:3

piece 20:25

place 20:12 21:6 27:17 63:7 73:8 76:14 77:18

placement 37:18

plaintiff 7:25 69:7 70:17,18 72:5

plaintiff's 42:3 70:3

plan 38:18 41:3,11 59:18,22,24 60:7 77:1,3,4 80:2

planned 32:19

planning 46:16

play 61:11

point 6:7,17 23:13,14 30:16 33:11 41:14 47:6 56:4,20 75:24 81:21

pointing 47:22

points 40:17 75:22

policies 16:24 17:22 18:6,23 19:20 21:8,9 33:23

policy 9:10 16:20 19:2,9,12,13, 16 20:2,20,21 21:14,15,21 22:6, 15,19 23:11 25:14 26:6 27:8 28:14 30:11 31:10 32:4 34:6,7,24 36:23 38:4,12,13,25 40:2 41:2,5 60:24 62:3 64:20 78:7 79:21

policy's 79:17

poor 47:15

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 94 of 109

**poorly** 28:3

**posed** 48:3

**position** 15:18 23:14,20,21 24:4, 8,24 25:1,3,9 26:2 28:18 31:17 35:7,11,12,16,23 37:4,13 45:12, 13,14 46:2,3,7,17,18 47:2,5,6,8 48:7,16,23 49:6,19 50:19,20 51:3, 9 52:5,20,21,25 53:5,7,10,11,13 54:3,4,5,6,9,10,13,16,17,19,20 55:2 56:1,6 57:16,17 59:10,13 60:5,8 61:9,13,14,19,24 62:1,2, 19,20 63:6 64:18 65:22 67:5,8,18 68:8,9,13,16,18 69:16 70:18 71:10,14,20,21,22 72:20 74:3,7 75:10,12,17,21 76:1,4,9,15 77:12, 13,15,18,20,23,24 78:4,15,16 79:11,12,15 81:10,16 82:9,10,20, 21,25 83:21 84:5

**positions** 27:13,14 35:14 36:25 37:5,19 45:21,24 48:9 55:12,14, 15,24 56:13 59:9 69:6,15,21 70:2, 6,9,12,16 71:7,11 72:4,7,9,10,12, 23,24 73:2,8,21,25 74:11,16,18 76:1,17 79:16 80:8,18 83:18

**positive** 62:17 65:11,13,25

**posted** 70:13

**postings** 70:10 80:16

**potential** 33:3 34:6 40:4 41:16 61:2 62:10 64:6

**Powell** 12:23

**practice** 35:3 77:16 78:11

**practices** 17:22

**preparation** 13:3

**prepare** 11:7,11,18 12:19 41:4

**prepared** 10:6 11:2,3 64:11

**preparing** 11:25 12:7,9 31:9

**present** 39:11 78:8

**presented** 39:18

**presents** 41:20

**prevent** 5:16

**preventing** 34:2

**previous** 40:14 41:23 54:12 84:15

**prior** 32:24 51:10,14 52:11 59:8 73:17,19 82:7

**priorities** 75:11

**priority** 20:1,5,7 35:23

**private** 15:4

**probationary** 36:8 64:17,21,22

**problem** 4:19

**procedures** 33:12

**proceed** 39:24

**PROCEEDINGS** 4:1

**process** 11:13 29:11,22 35:4 53:20 57:4,9,14,18 64:12 67:21 70:14 72:15 77:16 80:8

**processes** 9:8

**produced** 13:8 44:5 57:15

**production** 42:4,24 57:22

**programs** 17:23

**promoted** 82:8,11

**promotion** 18:3 46:24

**proposed** 38:16 39:10 41:16 45:7,8,11,12,20 46:1 47:7 76:25

**proposing** 46:11,18

**protect** 22:15

**protected** 33:22 66:7

**provided** 11:16 42:17 51:6 64:5 80:15

**providing** 49:4

**public** 15:1

**pull** 43:20

**pulled** 60:9

**pulling** 81:19

**purpose** 53:12 64:23 66:20

**purposes** 21:15 22:15

**pursuant** 8:11

**put** 12:18 14:22 16:22 38:18 43:17 59:14 63:5,8 65:4

**putting** 77:1

**Q**

**qualifications** 79:1

**qualified** 69:7,15 70:4,10 71:13 72:5,8,17

**qualifies** 37:14

**qualify** 34:24

**question** 5:25 6:4,5,19,20,23 7:12,14 13:5 22:1,25 27:22 28:2 30:10 32:9 46:6 49:16 51:19 52:17 60:5 65:7 68:21,25 69:4,18, 21 75:1

**questions** 4:15 5:13,16,20 13:11 23:6 28:24 40:14 42:25 61:6 74:14 81:12 84:12,19,21

**quick** 40:7

**R**

**race** 33:9

**raised** 72:10

**rating** 31:10,12,25

**re-org** 46:3

**reached** 34:14

**read** 33:14 34:16 50:1 52:6 70:19

**reading** 52:11 63:23,25 69:20

**reason** 29:13,17 53:15 64:11,13, 15

**recall** 4:18 17:9 51:13 74:15 77:19 78:3

**receive** 13:23,24

**received** 14:6

**receiving** 44:13 59:11

**recent** 31:11,25

**receptionist** 48:18

**recess** 40:10 73:14 84:13

**reclassification** 50:6 51:8,12 53:19,23 54:6

**reclassified** 45:16

**reclassify** 49:19 50:19,24 52:5, 22 53:4,10,13 55:20 59:9 68:8

**reclassifying** 51:3 52:20 54:16

**recognized** 56:15

**recollection** 10:4

**record** 6:25 7:5,24 40:8 42:15 43:5,7 60:6 73:13 84:11

**records** 51:5,6

**reduced** 37:9

**reduction** 11:14 16:25 17:6 18:3, 22 19:2,14,23 20:1,5,6,11,15 21:1,5,11,14,18 29:4 30:15 33:7 34:22 38:16 59:18,22,24 61:21 75:2,5,9 80:2

**reductions** 16:11,14 17:10 19:9

**reference** 51:7

**referenced** 82:15

**referring** 8:1,6 59:6

**reflect** 7:1

**refresh** 10:4

**refuse** 38:18

**related** 37:10

**relates** 16:14

**relationship** 16:7

**relative** 30:6,9,13,25 61:1 62:7 67:20

**relevant** 62:20 66:8 67:10 68:12 74:2

**remain** 36:3

**remaining** 54:21

**remember** 44:13,15 60:13 76:20

**reorganization** 58:3,10 77:5

**reorganizing** 57:21

**repairmen** 25:8

**repeat** 69:18

**rephrase** 5:25

**replaces** 53:21

**report** 48:3,6,8 49:9 75:18

**reporter** 76:10

**reporting** 27:15 48:11

**represent** 50:1 51:4 57:19 80:24 81:17

**representing** 4:14 6:10

**request** 41:12 42:4 52:5 54:18

**requesting** 49:19 54:19 59:10

**required** 28:18 29:12 39:3,23 67:14 75:10

**requirement** 54:11 79:18

**requirements** 78:14

**requires** 25:16 54:9

**requiring** 28:19

**resources** 8:24 9:9 14:7,24 17:13,17,20,22 18:13,17 26:15,25 33:20,23 35:15 38:5,15,24 39:9, 23 40:2 41:8 55:17

**response** 10:11 11:16

**responses** 42:2,11,19,21 68:20 69:13

**responsibilities** 49:21

**resulted** 17:6 59:25

**results** 81:4

**resumes** 72:13

**retrained** 37:18

**retraining** 37:20

**review** 13:6 16:20 32:4,15 39:1, 10,15 40:3 41:2,8,15 50:18 51:4,6

**reviewed** 11:13 39:5 40:25 43:11 56:12

**reviewing** 38:25

**reviews** 38:24 40:20

**revised** 42:12 43:14 50:18

**rid** 29:23 30:12

**RIF** 21:22 22:8 26:10 27:18 28:6, 15 29:3,11,22 30:5,11,14 31:3,6, 23 32:6,14,16,19,24 33:13 34:13 35:8,23 36:11,17,20 37:7,10,24 38:13,20 39:11,20,23 40:1,4,21 41:3,10,16 60:24 62:3 65:10 66:11 67:7,8 78:8

**rights** 33:12

**role** 16:13 28:22 30:18 48:21 49:2 52:10 61:8,11 62:1 68:12 76:2 77:9

**room** 58:15 74:13 83:10

**rude** 7:3

**Rule** 8:11

**rules** 55:23

**running** 75:18

## S

**safe** 9:11 26:8 45:18 81:20

**sake** 7:23 60:6

**Sandra** 10:22 12:24 43:24 44:7 50:14 59:2

**satisfy** 79:17

**scope** 34:1

**search** 56:2 57:12 58:8 72:22 81:1,15

**searched** 74:20 81:2

**searches** 71:23

**secretarial** 48:18

**section** 23:10 29:9 30:5,6 31:11 33:2,6,10 34:12

**selected** 8:25 9:4,6 82:11

**selection** 33:12 71:18

**seminars** 14:10,13

**sense** 54:15 58:11 71:18

**sensitive** 60:17

**sentence** 75:8

**separate** 29:12 36:14 47:18 64:20

**separation** 19:18,22 20:2,21,23 33:13 80:10,12

**service** 61:3 66:15 67:1

**set** 7:22 18:17 25:17 26:4,5 34:23 41:10 42:3 56:11 62:2 66:8 79:11, 12

**severance** 21:3 38:23 41:12

**sex** 33:9

**shadow** 47:23

**share** 18:16

**Sheila** 43:24 44:7 50:14 52:4 55:7 59:12

**short** 40:12 84:15

**shortages** 23:23

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 96 of 109

shorter 66:21

shorthand 7:25

SHRA 52:25 59:13 76:23 77:13, 15

side 43:18 59:15

sign 39:11

signature 39:2,14 42:7,8

significant 16:2 27:24 28:19,20

significantly 15:24 55:25 75:14, 22

signs 38:24 41:6

similar 24:1

simply 23:20 34:21

sir 80:19

sitting 4:24 27:6 28:4

situation 9:10 16:20 24:21 78:8

situations 20:8,25

skill 25:17 26:1,4

skills 78:18 79:2,7

skip 62:6

slash 49:18

software 25:20 26:1

solely 26:11

sooner 51:24

sort 28:21 55:12

sound 18:10

sounds 5:6

speak 8:25 9:4,7

speaking 8:16 60:13

specialist 46:2 47:17,24 48:1,4, 6,10,16,21 49:2,10 76:9,18 77:6, 22 83:18

specialists 82:17

specific 9:10 16:13 27:11 28:10 30:19 61:23

specifically 12:23 24:15 38:13 50:17 52:16

specifics 23:3

spent 11:25 79:5

staff 81:2

stage 13:9

standard 75:18

stands 81:9

start 23:10 60:3 61:7

started 57:3,4 83:20

starting 53:7

state 6:10 8:7 11:16 12:24 13:7 17:13,14,20,23 18:5,23 19:9 33:19,20 35:14,15 41:15,20 45:4 48:16 55:17 80:16 81:1

states 17:20

statewide 74:12

status 36:10,15 64:21

statute 27:7

stay 78:11

stop 6:15

stretch 40:8

structure 27:15 35:2

subject 17:12 35:8 61:21

subjected 21:18,22 22:7

suggests 47:9

summarize 39:7

supervisor 10:22 11:15 16:18 24:12 31:13 71:8

supervisors 16:18 26:9

supplemented 42:16,20

support 46:1 47:16,24 48:1,3,6, 10,15,20 49:2,4,10 75:11 76:8 77:5,22 82:17 83:17

supported 53:2

supposed 21:10 35:20 39:10 40:3 41:18 47:25 48:2 49:2,9 59:3 65:9 66:25

sworn 4:5

system 16:7 41:7,15 55:10,22 56:12

systematic 34:14,18,24 36:19 79:18

**T**

taking 39:1

talk 13:2 74:13

talked 6:9 11:21 37:14

talking 6:15 7:9 29:1

targeted 66:11 67:7,8

targeting 32:5,16

tech 55:24

technician 28:17 47:5,17 48:2,7 49:20 50:4 52:10 55:21 60:4 63:25 64:4 66:17 68:12 70:5 72:9, 24 73:9,24 74:5,6,19,21 75:17 76:2 81:16,22 82:6

technicians 56:17,22 63:20 65:2 78:22

telling 74:15

temp 64:22

template 64:12 67:15

temporary 36:9,15 64:17,22

ten 12:11,13 30:2,18 68:24 69:3 71:2

tenured 66:17,21,22

term 7:25 8:5 28:2 29:3 45:16

terminated 81:25

termination 69:8 70:3 72:5

terms 7:24 18:4 75:16

testified 4:6 53:10 62:12

testifies 77:21

testify 8:12 10:7 11:2

testifying 13:1

testimony 8:17 12:20 41:23 56:23 63:14 67:6 72:2,21 75:25 77:8,24 78:2

theoretically 32:2,13

thing 6:18 7:7 28:7,21 29:17 55:13

things 22:13 27:15 29:20 35:20 41:13 58:14

thinking 30:10 37:22 41:4 65:10 84:4,7

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

Page 97 of 109

Case 5:24-cv-00219-BO-RN    Document 28-2    Filed 07/07/25    Page 97 of 109

**thirteen** 10:5,6 44:2,22 68:25 69:4,21 71:25

**thought** 24:12

**time** 4:12 6:7 7:19 12:2 17:9 19:17,21 22:3 25:12 27:18 28:12 32:11 40:7 42:13 45:13 52:12 56:4 59:3 69:7,19,22 70:2 74:10 76:16 77:1 81:21 82:3 84:19

**times** 5:19,22 38:10 58:14 59:5

**title** 8:21 35:13,16 36:12 46:19 52:24 53:16 81:10

**today** 5:4,9,17,19 6:4,7 7:24 9:1, 23 11:2,7,18,25 12:8 13:8 27:6 28:4 53:6 55:23 72:3

**today's** 13:3

**told** 4:23

**top** 68:1

**topics** 9:13,25 10:5,6,7,11,14,18 11:1 14:22

**track** 12:17

**training** 13:25 14:1,2

**trainings** 18:3

**transcript** 7:15 29:2

**treated** 21:16,23 22:8,9,21

**truth** 4:23 5:4,9

**truthfully** 5:16

**turn** 25:2 30:1 34:9 44:21 58:21 59:16

**turned** 62:19

**Turns** 65:2

**type** 20:22 26:3 48:18 61:1,7,15 62:3

**typewriter** 25:8

**typically** 24:6 35:1

---

**U**

**Ultimately** 65:12

**UNC** 13:21 16:6 41:7,15 55:22 56:12

**undergrad** 13:17

**understand** 4:22 5:3,13,20,22

8:3,8 22:1 25:5,7 29:3,7 56:3 79:1

**understandably** 54:17

**understanding** 18:12 23:9 29:21 54:20 55:21 63:18 79:20

**understood** 6:5 22:25 27:21 32:9 58:18,20 60:19,21

**undertake** 37:24

**unfairly** 21:23 22:8,9,21

**unfavorable** 63:4

**uniform** 33:11

**unit** 16:3 25:16

**universities** 15:1 17:24

**University** 8:5,7,13,15,22 9:7,13, 14,19 10:8,19 12:19,24 13:7,13 15:15 16:10,11,15 17:1,9,12 18:16,20 20:23 21:13,20,23 22:5, 8,9,19 25:7,10 26:5 27:7 28:13 29:10 33:25 34:19 35:19 36:19 37:2,9,12,17,19,24 38:3 39:10 40:20 48:17 51:7 52:9,19 55:10 56:4 57:12 58:7 62:23 65:8,18 66:18,25 69:5,13 72:3,22 73:8,22 74:12,20 75:8 76:7 78:6,19,24 79:6,7 80:11,17

**University's** 23:8 38:4 67:10 77:8 79:15 81:1

**untouched** 54:21

**update** 25:11

**utilization** 33:9

---

**V**

**vacancies** 64:19 73:22 74:20

**vacant** 36:25 37:4,5,13 64:18 69:6 70:2,5,16 71:7 72:3,7 76:23 82:21,22 84:5

**VC** 46:16

**verbal** 60:12

**verbalize** 6:23

**versed** 23:7

**versus** 66:21 76:2

**vice** 46:19,20 56:10

**video** 6:24

**violation** 33:10

**vocational** 13:25

---

**W**

**Walk** 20:3

**walked** 83:10

**wanted** 75:1

**warrant** 53:19

**weeds** 4:15

**weigh** 61:16

**weighed** 62:4,24

**weighing** 61:23

**weighted** 63:5 68:6

**Wells** 81:14,15,21 82:6,12 83:6

**white** 27:11

**Williams** 10:22 12:25 13:2 43:24 44:7 48:6,8,12 49:5 51:15,18 52:15 55:7,20 56:5 60:13 74:14, 15

**word** 26:6

**work** 16:18 23:18,23 25:16,18 48:18 61:3 62:11 63:12 64:7 78:23

**worked** 14:3 15:4 78:24

**working** 14:23 25:6 51:22 75:16 82:1

**Wright** 43:25 44:7 50:14 55:7 59:12

**writes** 59:2

**writing** 51:8 57:9 58:17

**written** 27:11 55:5

**wrong** 39:8 59:5

**wrote** 32:5,15

---

**Y**

**years** 15:8,16 16:10,17,25 79:6

**yellow** 46:11

**younger** 82:13 83:3,7

www.NCDepo.com
info@NCDepo.com

Depositions, Inc.
Serving all of North Carolina

(919) 557-4640

Case 5:24-cv-00219-BO-RN    Document 26-2    Filed 07/07/25    Page 98 of 109

## Z

**Zeigler**  43:25 44:8 50:14 51:22
  55:7 59:12

**Zoom**  47:21

# Reduction-In-Force

## Contents

§ 1.  Policy ................................................................................................................1

§ 2.  Retention Factors ...............................................................................................2

Type of Appointment: .................................................................................. 2

Relative Efficiency....................................................................................... 2

Actual or Potential Adverse Impact.............................................................. 2

Length of Service ....................................................................................... 3

§ 3.  Area of Analysis for RIF: ......................................................................................2

§ 4.  Avoiding a RIF ...................................................................................................3

§ 5.  Office of Human Resources Responsibility .............................................................3

§ 6.  Agency or University Responsibility ......................................................................3

§ 7.  Notification Requirement .....................................................................................4

§ 8.  Appeals .............................................................................................................4

§ 9.  Leave ................................................................................................................4

§ 10.   Effective Date and Duration ...............................................................................4

§ 11.   History of this Policy .........................................................................................4

---

## § 1.  Policy

An agency or university has the authority to separate an employee whenever it is necessary due to:

- Shortage or loss of funds;
- Shortage or loss of work;
- Abolishment of a position; or
- Other material changes in position duties or organization

No loss of funds shall be required as a precondition for a reduction in force; however, an agency or university may not use the RIF process to circumvent the disciplinary process required to separate or demote an employee for a disciplinary reason.

RIF procedures also apply to position or budgetary changes that result in an involuntary reduction in an employee's work hours.

---

### § 2.  Retention Factors

Retention of employees in classes affected by a RIF action shall be based on a fair and systematic consideration, at a minimum, of the following factors:

- Type of appointment;
- Relative efficiency;
- Actual or potential adverse impact on the diversity of the work force; and
- Length of service.

Although all retention factors must be evaluated, they may be weighted differently for each RIF event to meet the needs of the employing agency or university.

---

### § 3.  Area of Analysis for RIF:

The analysis may include all or part of an agency (a unique work unit, division or entire agency/university). Differences in operation, work function, funding source, staff, and personnel administration may be considered when determining the appropriate area of analysis. However, the analysis to avoid a RIF must apply to the entire agency/university.

1. <u>Type of Appointment:</u>  Neither temporary nor probationary employees in their initial 12 months of employment (or initial 24 months of employment for sworn law enforcement officers) shall be retained in classes in which employees with permanent appointments (those who have satisfactorily completed a probationary or equivalent trial period) must be separated in the same or related class.

2. <u>Relative Efficiency:</u>  Relative efficiency shall be expressed as the employee's most recent overall performance rating. Management may also consider the rating for each individual or institutional goal and value when overall performance ratings are equivalent, documented employee skills and ability to perform the remaining work required of class members after the implementation of the RIF, and any active disciplinary action(s) received by the employee.

3. <u>Actual or Potential Adverse Impact:</u>  In accordance with federal guidelines affecting equal employment opportunity and affirmative action, all decisions concerning reduction-in-force must be analyzed to determine their impact on agency utilization goals based on race and sex to avoid adverse impact in

**EXHIBIT**

No. 2 - 3/10/25

---

**Policy on Reduction in Force**



violation of Section 4.d of the Uniform Guidelines on Employee Selection Procedures as applied to selection rates for separation through RIF.

4. <u>Length of Service:</u> Total state service determines length of service credit. In determining the length of service credit, an eligible veteran shall be accorded one year of state service for each year, or fraction thereof, of military service, up to a maximum of five (5) years of credit.

## § 4. Avoiding a RIF

A decision to implement a RIF must be reached only after the systematic consideration of actions designed to avoid the layoff. These actions may include but are not limited to the elimination of vacant positions; reduction in non-personnel related expenses; placement in a vacant position for which the employee qualifies; or retraining employees to facilitate placement in other positions at the agency or university.

## § 5. Office of Human Resources Responsibility

The responsibilities of the Office of State Human Resources (OSHR) shall include, but are not limited to the following:

1. Establishing the Reduction in Force (RIF) Plan Requirements and Program Guidelines to be followed by all agencies and universities to ensure commitment to, and accountability throughout, State Government;

2. Reviewing, approving and monitoring RIF plans and updates for agencies;

3. Providing technical assistance, training, oversight, monitoring, evaluation, and support to the RIF program; and

4. Developing, updating, and maintaining the RIF Priority Verification List database system.

## § 6. Agency or University Responsibility

The responsibilities of each Agency Head, Department Head and University Chancellor, or their designees, shall include:

1. Adhering to the RIF policy and programs that have been adopted by the State Human Resources Commission and approved by the Governor;

2. Agencies only: Submitting RIF plans and any necessary updates for approval by OSHR a minimum of one week prior to notifying employees of RIF actions; and

3. Universities only: Submit RIF plans and any necessary updates for approval by the President of the University System (or a Chancellor of a constituent institution, if delegated this power by the President of the University System) a minimum of one week prior to notifying employees of RIF actions.  Submit approved RIF plans to OSHR for informational purposes within five (5) calendar days after approval.

4. Submitting employee information within 30 days of RIF notification to OSHR to maintain the RIF Priority Verification List.

### § 7.  Notification Requirement

The employing agency or university shall notify the employee in writing as soon as possible and in any case no fewer than 30 calendar days prior to the effective date of separation. The written notification shall include the reasons for the reduction-in-force,

### § 8.  Appeals

An employee separated through a reduction in force may appeal the separation only on the grounds listed in the applicable Employee Grievance Policy.

### § 9.  Leave

<u>Vacation Leave:</u>  Employees may request, subject to approval by management, to exhaust vacation leave and be paid in a lump sum for the balance not to exceed 240 hours. If an employee had over 240 hours of vacation leave at the time of their separation the excess leave shall be reinstated when reemployed within one year after separation.

<u>Bonus Leave:</u> Bonus leave will be paid in a lump sum if eligible.

<u>Sick Leave:</u> Employees separated due to reduction-in-force shall be informed that their sick leave shall be reinstated if employed in any agency or university within five years.

### § 10.  Effective Date and Duration

This Policy is effective at the beginning of the day on October 7, 2021.

### § 11.  History of this Policy

| Date | Version |
|------|---------|
| 7-28-1949 | First version |

| 8-03-1973 | Established procedure for lay-off and demotion to effect reduction in force in the Employment Security Commission. |
| 1-25-1974 | A permanent employee who is separated due to reduction in force shall have the right to appeal to the State Personnel Board for a review to assure that systematic procedures were applied equally and fairly. |
| 1-01-1976 | Includes provisions for competitive service positions and provides that all reductions in force be based on systematic consideration of time of appointment, length of service, relative efficiency. |
| 3-01-1978 | If an employee with five years of service is either transferred to an exempt position or occupies one that is declared exempt, upon leaving that position for reasons other than just cause, such employee shall have priority to any position that becomes available for which the employee is qualified.<br><br>A permanent employee, who has been or is scheduled to be separated due to reduction in force, shall have priority to any position that becomes available for which the employee is qualified. |
| 8-01-1978 | Reduction in force – priority consideration defined. |
| 8-01-1979 | Severance pay equivalent to two weeks approved by 1979 GA. |
| 3-04-1981 | Emergency regulation on reduction in force. |
| 6-01-1981 | Revision in the wording of the policy to include "neither temporary, probationary nor trainee employees shall be retained in cases where permanent employees must be separated in the same or related classes." AND that type of appointment, length of service and relative efficiency do not necessarily have to be considered in that order. |
| 08-01-1981 | Policy changes due to Governor and Legislature requesting reduction in work force. |
| 10-01-1984 | Amendments to AA Policy and RIF. |
| 06-01-1985 | Deleted competitive service provisions. |
| 07-01-1985 | Section on Appeals revised to conform to Legislation requiring years of service in certain pay grades before becoming a permanent employee. |
| 02-01-1987 | Agency responsibility clarified (1) guideline must be openly available for review (2) must inform employees in writing of reasons of RIF, eligibility for priority, appeal rights, and other benefits (3) must give two weeks notice. |

| | Affirmative Action changed to state all decisions must be analyzed to determine impact on departmental utilization goals and to avoid adverse. |
|---|---|
| 08-01-1988 | Reinstatement of sick leave changed to five years instead of three years. |
| 11-01-1990 | Leave Without Pay Option deleted since no longer needed. |
| 4-01-1993 | Priority Reemployment Consideration – revised to allow a new probation period in certain situations involving the reemployment of a person involved in reduction-in-force. |
| 3-01-1994 | Changed "permanent" to "career." |
| 4-01-1995 | Note about veteran preference added for clarification. |
| 12-1-1995 | Revised to conform to reduction-in-force statutory provisions. |
| 6-01-2008 | Under the paragraph on Leave, added provision that leave in excess of 240 shall be reinstated if reemployed within one year.  (This provision has been in the Reinstatement Policy since 2002.  It is added here for clarity.) (2) Changed policy to allow an employee who is reduced in force to exhaust vacation leave after their last day of work and still be paid for up to 240 hours of leave in a lump sum. |
| 1-01-2009 | A decision of the N.C. Court of Appeals said that an issue regarding the manner in which a reduction in force is carried out is no longer considered a contested case issue; therefore, the paragraph on Appeals is changed to recognize the impact of that decision. (The rule will be changed to reflect this change also.) |
| 3-01-2011 | The paragraph on Appeals was changed (per Lynn Floyd) to include appeal if it is alleged that the separation is a denial of the veteran's preference granted in connection with a reduction in force.  (This change is simultaneous with the publication of the new Manual; therefore, no revision was sent out separately.) |
| 12-01-2013 | Section on "Appeals" changed to refer RIF employees to Employee Grievance Policy found in Section 7 of the HR Manual. |
| 10-01-2014 | Changed trainee eligibility period from 6 months to 24 months to align with the legal definition of probationary period.

Notification requirements were moved from "agency responsibility" and put in an independent section to place emphasis on the requirement.

Removed the requirement for agencies to send applications of RIF employees to OSHR. |

| | Added a clarifying statement in the "leave" section that one year time period for reinstating excess leave is from the date of separation and not the date of notification of separation. |
|---|---|
| 2-06-2020 | Policy reviewed by the Diversity and Workforce Services Division to confirm alignment with current practices and by the Legal, Commission, and Policy Division to confirm alignment with statutory, rule(s), and other policies.  Reported to SHRC on February 6, 2020.<br><br>North Carolina General Statute has been updated to reflect that no loss of funds shall be required as a precondition for a reduction in force (N.C.G.S. § 126-7.1 (b)).  The policy revisions reflect this change, as well as adding some clarification regarding retention factors. |
| 10-07-2021 | Policy reviewed by the Diversity and Workforce Services Division to confirm alignment with current practices and by the Legal, Commission, and Policy Division to confirm alignment with statutory, rule(s), and other policies. The RIF policy was modified to reflect changes included in HB602 that allows the UNC System to approve RIF Plans. |

**Background:**

Fayetteville State University, Division of Business and Finance/ Budget Office is implementing a reduction in force (RIF) because of material changes in position duties required to support current priorities and business needs. The changes in position duties will result in abolishing an Accounting Technician position and establishing a new position to address new skills required. This RIF is not being used to circumvent the disciplinary process required to separate or demote an employee for disciplinary reasons.

This action will result in the separation of one (1) employee in the Division of Business and Finance/ Budget Office. There are a total of eight (8) positions in the Division, and one (1) of these 8 positions is in the Budget Office; two (2) of the positions are vacant and six (6) positions are filled. The layoff unit is defined as the Division of Business and Finance/ Budget Office.

**Criteria:**

University management considered the retention of the employee in the Accounting Technician classification affected by a RIF action based on a fair and systematic consideration, at a minimum, of the following factors:

- Type of appointment.
  - Neither temporary nor probationary employees in their initial 12 months of employment (or initial 24 months of employment for sworn law enforcement officers) will be retained in classes in which employees with permanent appointments (those who have satisfactorily completed a probationary or equivalent trial period) must be separated in the same or related class.
- Relative efficiency.
  - Relative efficiency has been expressed as the employee's most recent overall performance rating.
- Actual or potential adverse impact on the diversity of the work force; and
  - In accordance with federal guidelines affecting equal employment opportunity and affirmative action, all decisions concerning reduction-in-force have been analyzed to determine their impact on agency/university utilization goals based on race and sex to avoid adverse impact. Pre- and post- RIF demographic analysis is included.
- Length of service.
  - Total state service determines length of service credit. In determining the length of service credit, an eligible veteran have been accorded one year of state service for each year, or fraction thereof, of military service, up to a maximum of five (5) years of credit.

Each of these factors was fairly and systematically evaluated. However, some of the factors were weighted differently to meet the operational needs of the University. Relative efficiency

was a critical factor in the evaluation process due to the increased demands on the Budget Office that require additional knowledge and skills.

**Alternatives to Layoff:**

The University reviewed current and anticipated vacancies in the Division of Business and Finance for potential openings and has not identified a suitable opportunity for the affected employee. Throughout this process, we will continue to look for positions within the agency and in other agencies to avoid the involuntary separation of the employee. Contact has been made with the UNC System Office to review and approve this RIF plan.

**Composition of the Affected Work Force:**

| Name Demographics | Title/ Dept. | Comp level | Position Number | Funding Source | Length of Service (Years) | Performance |
|---|---|---|---|---|---|---|
| Lisa Bernard Female, Black, 56 | Accounting Technician, Budget | Journey | 000090 | State | 19 years, 3 months | Not Meeting Expectations |
| ▮▮▮▮ Female, Black, 37 | Accounting Technician, Finance | Contributing | 000055 | State | 3 years, 2 months | Meets Expectations |
| ▮▮▮▮ Female, Black, 41 | Accounting Technician, Finance | Journey | 000017 | State | 3 years, 1 month | Meets Expectations |
| ▮▮▮▮ Female, Black, 42 | Accounting Technician | Journey | 000118 | State | 17 years, 1 month | Meets Expectations |
| ▮▮▮▮ Female, Black, 52 | Accounting Technician, Finance | Journey | 000123 | State | 14 years, 9 months | Meets Expectations |
| ▮▮▮▮ Female, Black, 58 | Accounting Technician, Finance | Journey | 000293 | State | 14 years, 1 month | Meets Expectations |
| Vacant- being reclassed to Budget Analyst (EHRA) | Accounting Technician, Finance | Advanced | 000012 | State | | |
| Vacant | Accounting Technician, Finance | Advanced | 000121 | State | | |

Based on the criteria listed above:

The following employees will be retained:

    ▮▮▮▮ Position #000055
    ▮▮▮▮ Position #000017
    ▮▮▮▮ Position #000118
    ▮▮▮▮ Position # 000123
    ▮▮▮▮ Position #000293

The following employee will be separated effective April 30, 2023. Position number 000090, Accounting Technician-Journey, will be abolished. A new position will be created to address the knowledge and skills required to meet the business needs of the Budget Office.

Lisa Bernard, Position # 000090

**Timeline:**

Notice must be given to the impacted employee on or before March 31, 2023, in order that we meet the statutory requirement of thirty calendar days notification. The expected date of separation is April 30, 2023.

This proposed reduction in force will not adversely affect the agency's workforce demographics. An adverse impact analysis worksheet is attached.

If you have questions regarding this plan, please contact Kay Faircloth for additional information.

_____          3-24-2023
Agency Head Signature                     Date Signed

_____          3/24/2023
Director of Human Resources Signature     Date Signed